**UNITED STATES STEEL CORPORATION, and Youngstown Sheet and Tube Company, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

Nos. 78–1563, 78–1564.

United States Court of Appeals, Seventh Circuit.

Argued April 18, 1979.
Decided Aug. 1, 1979.

284

Laurence A. McHugh, James T. Harrington, Chicago, Ill., for petitioner.

Ronald C. Hausmann, U. S. Environmental Protection Agency, Washington, D. C., for respondent.

Before CASTLE, Senior Circuit Judge, CUMMINGS and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This case arises from the Environmental Protection Agency's promulgation of a list designating those areas which do not meet national primary or secondary ambient air quality standards. The petitioners attack these designations on both substantive and procedural grounds. We find both claims to be without merit, and we uphold the agency's designations.

I

Under the Clean Air Act, 42 U.S.C. §§ 7401–7626, the Administrator of the EPA was required to promulgate national primary and secondary ambient air quality standards. 42 U.S.C. § 7409(a). The Administrator has promulgated these standards and they are codified at 40 C.F.R. §§ 50.1–50.11 (1978). After these standards were established, the states had a statutory responsibility to develop implementation plans to achieve these standards. See 42 U.S.C. § 7410. The Act required the state plans to provide for the attainment of these standards no later than 1975. However, in 1977 it became clear that these standards had not yet been achieved. Accordingly, Congress amended the Act to restructure the scheme for attaining these standards. Clean Air Act Amendments of 1977, P.L. 95–95, 91 Stat. 685 (August 7, 1977). These amendments pushed the primary standard compliance deadline forward to 1982. 42 U.S.C. § 7502(a)(1). Further, to insure that this deadline would be met, Congress established a new implementation process. This implementation process was to begin with a combined state and federal effort for the designation of those areas not in compliance with air quality standards. 42 U.S.C.

§ 7407(d)(1).[1] The designation of an area as "nonattainment" imposes upon the state the obligation to include certain more stringent provisions in its implementation plan. 42 U.S.C. § 7502.

Under the scheme established by § 7407(d)(1), the states were required to submit to the EPA, within one hundred and twenty days after the passage of the Act, a list identifying the attainment status of all air quality control regions within the state. Pursuant to this requirement, Harry D. Williams, director of the Air Pollution Control Division of the Indiana State Board of Health submitted a draft copy of the state of Indiana's designations, indicating that a final copy would be sent on December 5, 1977, the statutory deadline. The final report designated portions of Northern Indiana in which petitioners operate steel works as nonattainment areas.

The EPA published its list of attainment designations, based on the state's submissions, on March 3, 1978. 43 Fed.Reg. 8962.[2] This list accepted the state of Indiana's designation of certain portions of Northern Indiana as "nonattainment." Furthermore, the EPA indicated that although these designations were to be immediately effective, it was soliciting comments on these designations for 60 days. Comments were submitted by the petitioners in this case and by other interested parties, and on October 5, 1978, the EPA reaffirmed its designation of certain portions of Northern Indiana as nonattainment, although it did make alterations in designations with respect to other areas. 43 Fed.Reg. 46007.

II

Petitioners contend that the EPA's promulgation of these attainment designations violated the procedural requirements of 5 U.S.C. § 553 by not providing for notice and comment prior to the effective dates of the designations.[3] We reject this contention on

---

1. The text of the provision is set out below:

List of noncomplying regions

(d)(1) For the purpose of transportation control planning, part D of this subchapter (relating to nonattainment), part C of this subchapter (relating to prevention of significant deterioration of air quality), and for other purposes, each State, within one hundred and twenty days after August 7, 1977, shall submit to the Administrator a list, together with a summary of the available information, identifying those air quality control regions, or portions thereof, established pursuant to this section in such State which on August 7, 1977—

(A) do not meet a national primary ambient air quality standard for any air pollutant other than sulfur dioxide or particulate matter;

(B) do not meet, or in the judgment of the State may not in the time period required by an applicable implementation plan attain or maintain, any national primary ambient air quality standard for sulfur dioxide or particulate matter;

(C) do not meet a national secondary ambient air quality standard;

(D) cannot be classified under subparagraph (B) or (C) of this paragraph on the basis of available information, for ambient air quality levels for sulfur oxides or particulate matter; or

(E) have ambient air quality levels better than any national primary or secondary air quality standard other than for sulfur dioxide or particulate matter, or for which there is not sufficient data to be classified under subparagraph (A) or (C) of this paragraph.

(2) Not later than sixty days after submittal of the list under paragraph (1) of this subsection the Administrator shall promulgate each such list with such modifications as he deems necessary. Whenever the Administrator proposes to modify a list submitted by a State, he shall notify the State and request all available data relating to such region or portion, and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate.

(4) Any region or portion thereof which is not classified under subparagraph (B) or (C) of paragraph (1) of this subsection for sulfur dioxide or particulate matter within one hundred and eighty days after August 7, 1977, shall be deemed to be a region classified under subparagraph (D) of paragraph (1) of this subsection.

(5) A State may from time to time review, and as appropriate revise and resubmit, the list required under this subsection. The Administrator shall consider and promulgate such revised list in accordance with this subsection.

2. The statutory deadline for promulgating these designations was February 3, 1978. As mentioned later in the text, *infra* p. 9, this failure to meet the deadline may have been due in part to late submissions by states.

3. The threshold issue posed by this contention—*viz.*, that the designations constituted rulemaking—is not without difficulty, despite

two grounds. First, we hold that the agency had "good cause" to postpone the proceeding within the meaning of section 553's specific exemption. Second, we find that even if the agency lacked "good cause" within the terms of section 553, we are precluded from reversing by the Clean Air Act. The Act limits the circumstances in which rules promulgated by the EPA may be reversed for procedural errors.

### A

Section 553(d) of the Administrative Procedure Act contains two "good cause" exceptions. The first, section 553(b)(B) provides that notice of, and public comment on, agency rules may be dispensed with "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." The second, section 553(d)(3), provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date except . . . (3) as otherwise provided by the agency for good cause found and published with the rule." Accordingly, in a case such as the one before us where a regulation is made effective before notice and comment, the agency could rely on either "good cause" provision. Thus, the EPA made its attainment designations immediately effective, stating:

> the Fifth Circuit's unanalyzed assertion that "the designations clearly come within the broad statutory definition." *United States Steel Corp. v. EPA*, 595 F.2d 207, at 213 (5th Cir. 1979). The Administrative Procedure Act defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4). Although the words "or particular applicability" perplexingly appear to expand this definition beyond useful perimeters, the legislative history demonstrates that these words were added late in the consideration of the act to prevent legislative-type promulgations from falling outside the definition of "rule" when they were directed to "named persons." S.Rep. No. 248, 79th Cong. 2d Sess. 283 n.1 (1946); K. Davis, Administrative Law Treatise § 5.02, at 295–96 (1958). Thus, where a general statement of policy is directed to a group of multiple, but specified, parties, the statement is a rule. However, a designation, such as the one in this case, that applies solely

The States are now preparing revisions to their State implementation plans (SIPs) as required by sections 110(a)(2)(1) and 172 of the Act. This enterprise, which must be completed by January 1, 1979, requires that the States have immediate guidance as to the attainment status of the areas designated under section 107(d). Congress has acknowledged this by imposing a tight schedule on the designation process and requiring EPA to promulgate the list within 180 days of the enactment of the amendments. Under these circumstances it would be impracticable and contrary to the public interest to ignore the statutory schedule and postpone publishing these regulations until notice and comment can be effectuated. For this good cause, the Administrator has made these designations immediately effective.

The agency's statement of "good cause" does not reveal on which of the two provisions the agency was relying. Although at least two commentators have suggested that the two provisions provide the same standard of good cause,[4] we believe that the standards are distinct and that the agency action, while justifiable under the (b)(B) standard, is unquestionably, justifiable under the broader standard set out by (d)(3).

Turning first to whether the agency action here was justified under the narrower

> to a specific, delimited situation is an entirely different matter. Indeed, the EPA's designation of areas as nonattainment is directly analogous to the Secretary of Transportation's designation of areas in public parks as necessary routes for the construction of highways, a function which the Supreme Court termed as "plainly not an exercise of a rulemaking function." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Under this theory, the agency's designation of attainment areas would not be subject to the requirements of section 553. Since the agency, however, has termed these designations as rules, we need not reach this issue.

4. *See* K. Davis, Administrative Law of the Seventies § 6.01–11 at 207 (1976); Bonfield, *Public Participation in Federal Rulemaking Relating to Public Property, Loans, Grants, Benefits, or Contracts*, 118 U.Pa.L.Rev. 540, 599–600 (1970).

(b)(B) standard, we find that such justification existed under the impracticability standard embodied in the statutory language of the first good cause exception. The legislative history of this impracticability standard reveals that Congress intended this exemption to operate when the regular course of rulemaking procedure would interfere with the agency's ability to perform its functions within the time constraints imposed by Congress. Early versions of this provision allowed public participation to be dropped where it was "impracticable because of unavoidable lack of time or other emergency." S.Doc.No.248, 79th Cong., 2d Sess. 140, 148, 157 (1946). The exception was broadened by the elimination of this qualifying language. The Senate and House Reports interpreted "impracticable" in this broader formulation as a situation "in which the due and required execution of the agency functions would be prevented by its undertaking public rule-making proceedings." *Id.* at 200, 258.

Two other courts have agreed that the "good cause" exception may be utilized to comply with the rigors of a tight statutory schedule. In *Clay Broadcasting Corp. v. United States*, 464 F.2d 1313 (5th Cir. 1972), *rev'd on other grounds sub nom. National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), the court held that the FCC had good cause to dispense with rulemaking before altering a license fee schedule since

> (1) wide-spread notice in fact would be provided affected parties; (2) a first of the month effective date was required for administrative pro-ration of yearly fees; and (3) that in accordance with Congressional directives the Commission wanted

the fee schedule to cover as much of fiscal 1971 as reasonably possible.

*Id.* at 1320. Likewise, in *Energy Reserves Group v. FEA*, 447 F.Supp. 1135 (D.Kan. 1978), the Court found that promulgation without rulemaking proceedings of regulations defining a congressional exemption to its oil price control scheme was justified under the "good cause" exemption. Congress required these regulations to be promulgated in 15 days, leading the court to find "good cause" to rely on "the legislative requirement of expeditious promulgation." *Id.* at 1150.

The legislative scheme involved in this case also confronted the EPA with a series of tight statutory deadlines. The EPA was given 60 days after the date on which states were required to provide lists of nonattainment areas to promulgate final designations of nonattainment areas. 42 U.S.C. § 7407(d)(2). More importantly, the states were required to have promulgated implementation plans for designated nonattainment areas by January 1, 1979. 42 U.S.C. § 7502 (annotation) [Pub.L. 95–95, § 129(c)]. These plans are to provide for attainment in these areas "as expeditiously as practicable . . . [but] not later than December 31, 1982." 42 U.S.C. § 7502(a)(1). Furthermore, the development of these plans is a time-consuming process, requiring formal involvement by the public, local governments and state legislative bodies as well as the redevelopment of current emissions inventories. *Id.* at § 7502(b). These deadlines were a response to the failure of the states to meet prior attainment deadlines and represent Congressional concern over the seriously adverse health consequences of continued nonattainment.[5] H.Rep.No.

---

5. Ironically, much of the Congressional concern over delays in meeting ambient air quality standards was directed at the failure of the petitioners in this case to reach compliance. The only specific example of nonattainment given by the House Report was contained in the following passage:

> The committee is also mindful of the fact that several categories of major polluters have not complied with emissions limits in nonattainment areas. The 1975 subcommit-

tee hearings reflect this disturbingly high incidence of noncompliance. In particular, the following testimony is of great concern:

> Mr. ROGERS. Let's .see, we have had the law 5 years now. Could you tell me company by company, how many of your plants are in compliance presently and how many are not?
>
> Mr. ARMOUR [Interlake, Inc.]. I think we have to define in compliance with what.
>
> Mr. ROGERS. The Clean Air Act?

294, 95th Cong., 1st Sess. 207–211 (1977). Thus, the EPA was properly concerned that these explicit deadlines be met. This concern was magnified by the fact that some states, such as Wisconsin, were almost 2 months late in submitting their proposed designations. See *Oscar Mayer Co. v. Costle*, No. 78–1548 (7th Cir. 1978) (decided with this case). Since some of these designations had to be rejected by the EPA,[6] more time was required between the state submission and EPA publication. Adding

one month for comment and four months to review and respond to these comments,[7] compliance with notice and comment procedures would have delayed promulgation by five months or more, leaving the states with less than 6 months to formulate implementation plans. Thus, given the "legislative requirement of expeditious promulgation," [8] the need for the states to begin promptly their own planning process,[9] and the continuing adverse impact on health that any further delays would entail,[10] we

---

Mr. ARMOUR. We do not have any in compliance.

Mr. ANDERSON [Bethlehem Steel Corp.]. None.

Mr. JAICKS [Inland Steel Co.]. None.

Mr. MALLICK [U.S. Steel Co.]. None.

Mr. TUCKER [National Steel Corp.]. We have no plants in compliance.

Mr. JAICKS. It sounds terrible. But these are hard value money expenditures.

H.Rep.No.294, 95th Cong., 1st Sess. 210–11 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1289. Given that the strict deadlines were intended to force compliance by U.S. Steel and others, we are hesitant to allow U.S. Steel to again delay compliance through its procedural challenges. We note that if we were to remand in this case, the entire deadline scheme would be thrown into complete disarray. State Implementation Plans, which were scheduled to be (and presumably were) formulated by January 1, would have to be further delayed while the EPA proceeded with yet another notice and comment period, and after promulgation of those designations states would have to repeat the hearing-consultation process in order to resubmit implementation plans. In the Fifth Circuit's remand of the rulemaking now before us, the court delayed the state deadline until nine months after the second "final" promulgation. This, of course, would (given four months to receive and evaluate comments) throw off the statutory scheme by almost two years. *See United States Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979). Thus, remand in this case would permit U.S. Steel to continue the very procrastination which Congress sought to end.

6. For example, the state of Wisconsin's designation of Madison had to be altered. See *Oscar Mayer Co. v. Costle*, No. 78–1548 (7th Cir. 1978) (decided with this case).

7. This is the time that it actually took the EPA to review these comments. The Third Circuit in its computation of the time that pre-promulgation notice and comment would have required in this case allowed the EPA only ninety days to evaluate. *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979). We see no reason

to adopt this apparent presumption that the EPA was dilatory or inefficient in reviewing the comments. As discussed further in note 14 *infra*, we believe that the Third Circuit ignored applicable law in its remand of the designations at issue in this case, and we have declined to adopt its reasoning or its result. *See* also note 11 *infra*.

8. Other cases finding that the agency had sufficient opportunity to meet deadlines and still supply prior comment opportunity are distinguishable in that they involved much longer time periods than the instant case. In *American Iron & Steel Institute v. EPA*, 568 F.2d 284 (3d Cir. 1977), the EPA knew of its duty to promulgate regulations three years before the deadline. Likewise in *Consumers Union of U.S., Inc. v. Sawhill*, 393 F.Supp. 639 (D.D.C.), aff'd, 523 F.2d 1404 (Em.App.1975) there was more than one year between passage of the act and the final deadline.

9. The need to supply information promptly to facilitate planning has been recognized by Congress as creating "good cause." A House Oversight Committee approved the Department of Agriculture's use of the exception to make last-minute changes in acreage allotments and marketing quota regulations without prior comment in order to facilitate farmers' planting decisions. Staff of House Comm. on Gov't Operations, 85th Cong., 1st Sess., survey and study of Administrative Organizations, Procedure and Practice in the Federal Agencies 26–27 (Comm. Print 1957), *as cited in Bonfield, supra* note 3, at 595.

10. The magnitude of this impact was set out in the most compelling terms by the House Report on the amendments:

In one of these studies, the National Environmental Research Center (1974) evaluated the potential public health effects of increased emissions of sulfur oxides from steam electric powerplants, attributable largely to increased use of coal in the absence of sulfur oxide stack gas cleaning. Ex-

hold that the administrator had "good cause" to exempt these designations from § 553.[11]

Even if the EPA's actions here were not justified by the impracticability standard of the § 553(b)(B) exemption, we nonetheless hold that it had "good cause" within the meaning of 553(d)(3). We disagree that the phrase "good cause" should be interpreted similarly in both provisions. First, Congress intentionally added modifying language giving specific instances of good cause to 553(b)(B), *i. e.*, where notice and comment are "impracticable, unnecessary, or contrary to the public interest." That language is missing in (d)(3). Furthermore, since (d)(3) only dispenses with *prior* notice and comment, and not notice and comment

cess mortality and illness rates were calculated by obtaining a damage function for each of five health effects associated with sulfur oxide exposure. Damage functions were based upon published results from studies in 2 to 6 geographic areas per adverse health effect. Population size and exposure for each electric power region east of the Mississippi River were considered, and estimates of illness attributable to sulfur oxides were derived. A portion of the results is shown in the following table:

ESTIMATES OF ADVERSE HEALTH EFFECTS ATTRIBUTABLE TO SULFUR
OXIDE EXPOSURES IN THE EASTERN UNITED STATES

| Adverse health effects | Estimate of illness attributable to acid sulfates | | | |
|---|---|---|---|---|
| | Standards met | | Standards not met | |
| | 1975 | 1980 | 1975 | 1980 |
| Million days of aggravated heart and lung disease | 5.3 | 1.2 | 24.4 | 33.8 |
| Increased number (millions) of asthma attacks | 2.5 | .8 | 8.8 | 11.5 |
| Thousands of lower respiratory diseases in children | 48.0 | 0 | 486.0 | 888.0 |

As shown, nonattainment of air quality standards in a wide and densely populated region could result in a phenomenal health impact, measured in terms of millions of days of aggravated disease, asthma attacks and lower respiratory disease episodes. Obviously, these are only projections, not predictions, of the impact of increased sulfur oxide emissions in an area that is already heavily impacted with emission sources. (1977 House hearings, American Lung Association, pp. 3–4).

H.Rep.No.294, 95th Cong., 1st Sess. 209 (1977), U.S.Code Cong. & Admin.News 1977, p. 1288. The Fifth Circuit in *United States Steel v. EPA*, 595 F.2d 207 (5th Cir. 1979), discussed and rejected at notes 11 & 14 *infra*, declined to apply the "good cause" exception in its review of the EPA rule under review here, holding that it was a "safety valve to be used where delay would do real harm" and citing as an example regulations designed to alleviate gas shortages and consequent violence at gas stations. See *Reeves v. Simon*, 507 F.2d 455, 458–59 (Em. App.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975). We are at a loss to understand how gas shortages and fistfights constitute "real harm" whereas mortality and illness resulting from continued high levels of air pollution do not.

11. Of course, a remand at this point would intolerably delay the implementation of the statutory scheme and completely frustrate the Congressional purpose. For example, the Fifth Circuit in *United States Steel v. EPA*, No. 78–1922 (5th Cir. May 3, 1979), admitted that this remand would delay state implementation plans by more than seven months. Slip op. at 14. This admission was somewhat conservative since the new time scheme dictated by the court to replace the Congressional scheme would have involved at least 13 months from the date of decision *not* counting the notice and comment period which we have suggested would add four to five more months. *See* text accompanying note 7 *supra*. Thus, the Fifth Circuit's remand will set back the schedule by almost two years behind the January 1, 1978 implementation date. Further, the Third Circuit's approach to this problem strikes us as unsound. Recognizing that the remand of the proceedings might "endanger the Congressional scheme for the control of air pollution," the Third Circuit attempted to resolve this difficulty by leaving the designations in effect except as to the two petitioners in the case before the court. *Sharon Steel Corp. v. EPA*, 597 F.3d 377 at 381 (3d Cir. 1979). If the rule is defective, however, we see no reason why anyone, whether they filed suit or not, should be subject to it. We, of course, have found the designation procedure valid and decline to follow the Third and Fifth Circuits. *See also* note 14 *infra*.

This opinion has been circulated among all judges of this Court in regular service. A majority did not favor a rehearing in banc on the question of this difference among circuits.

altogether, there is sound reason to believe that "good cause" should encompass more situations in (d)(3) than in (b)(B). Finally, the legislative history of (d)(3) shows that Congress considered a broader category of "good cause" for this exemption than those specified in the three instances set out in (b)(B). The House Report on the APA stated:

> Many rules . . . may be made operative in less than 30 days because of inescapable or unavoidable limitations of time, because of the demonstrable urgency of the conditions they are designed to correct, and because the parties subject to them may during the usually protracted hearing and decision procedures anticipate the regulations.

S.Doc.No.248, 79th Cong., 2d Sess. 260 (1946). In particular, the reference to "demonstrable urgency" appears to permit findings of "good cause" in more situations than (b)(B) would permit, and certainly such urgency exists in this case where any delay in the EPA's designation would run the risk of delaying the formulation of state implementation plans and the consequent health detriment of delayed nonattainment.

### B

█ Even if the agency's procedures here were not in technical compliance with § 553 of the APA, we would still not be able to reverse the Administrator's action in this case. We have already noted the Congressional concern manifest in the Clean Air Act that national attainment be achieved as expeditiously as practicable. This concern was reflected in the desire that the due administration of the statutory scheme not be impeded by endless litigation over technical and procedural irregularities. As the House Report to the Amendments stated:

Under the flexible procedures specified by the committee, disputed questions of classification may arise concerning, for example, whether a given question involves "facts" or "policy" or whether a given fact is "legislative" or "adjudicative". To prevent rulemaking from bogging down in arguments about such matters, and to underline that the agency is authorized to adopt rule-making procedures to the individual case, the committee has limited the extent to which the Administrator's decisions on such procedural matters may be reversed during judicial review.

H.Rep.No.294, 95th Cong., 1st Sess. 322 (1977), U.S.Code Cong., Admin.News 1977, p. 1401.

Accordingly, the following limitations on review were enacted. Section 7607(d)(9) provides:

> In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—
>
> . . . . .
>
> (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) [that "only an objection to a . . . procedure which was raised . . . during the period for public comment . . ." may be raised during judicial review] has been met, and (iii) the condition of the last sentence of paragraph 8 [that the procedural errors "were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors has not been made"] is met.

Even if this rulemaking procedure is not one of those specified in subsection (d),[12] the

---

12. Arguably these designations fit within the subsection's application to "the promulgation or revision of an implementation plan by the Administrator under section 7410(c) . . ." or to the "promulgation or revision of regulations under subtitle C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of

visibility)." 42 U.S.C. § 7607(d)(1)(B), (I). The designation of areas as "attainment" or "nonattainment" is an integral part of the promulgation of implementation plans and of regulations designed to prevent significant deterioration of air quality. See especially 42 U.S.C. § 7407(d)(1), stating that the designations are "[f]or the purpose of . . . part C of this

legislative report's reference to the legislative-adjudicative distinction (a procedural issue which is not addressed in subsection (d) and which relates to the propriety of any rulemaking at all) suggests that Congress meant this limitation on review of procedural errors to extend to all rulemaking by the EPA whether or not it is in the explicit categories covered by all the provisions of section 7607(d). Thus, section 7607(e) provides:

> Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter [*i. e.*, the Clean Air Act of 1970], except as provided in this section.

Applying section 7607(d)(9) to the alleged procedural errors in this case, we find that none of the prerequisites for reversal have been satisfied. First, given the statutory time constraints and the delays that would be occasioned by prior notice and comment, we cannot say that it was arbitrary and capricious for the Administrator to postpone notice and comment until after the effective date. Second, we find no evidence in the record that the petitioners ever raised these procedural matters in the notice and comment period. The only issues raised by them during that period related to the substantive validity of the designations. Finally, we cannot say that the rule under review would have been any different if notice and comment had occurred before the effective date. It is important to realize that the rule under review here is the

rule as finally promulgated in October 1978 and reflects many final changes made in the rule as a result of the EPA's consideration of submitted comments. *Compare* 43 Fed.Reg. 8963 (1978) *with* 43 Fed.Reg. 45988 (1978).[13] Given that the agency was clearly willing to consider, fully and objectively, all comments in the post-promulgation period, there is no reason to believe that its consideration of the comments would have been any different if completed before the effective date. Thus, we cannot make the required finding that the rule would have been different if the notice and comment period had occurred earlier.[14]

### III

The petitioners also challenge the designation of the northern portion of Lake County, Indiana as "nonattainment," arguing that the failure of the designation to delimit an even smaller portion of Lake County as the only nonattainment area was arbitrary and capricious. The designation was based on the following data. First, violations of sulfur dioxide primary standards were monitored at the Hammond continuous monitor during April 1976 as well as April and May 1977. Second, "the results of short-term modeling studies carried out for various sources in the area using the 1974 emissions . . . [indicated] the potential of reaching some very high level values . . . ." in the northern portion of Lake County. *See* Indiana Air Pollution

subchapter (relating to prevention of significant deterioration of air quality)." Subchapter C (42 U.SC. § 7470–91), for example, sets out the provisions applicable to areas designated "attainment." 42 U.S.C. § 7471. Likewise, state implementation plans must have special provisions for nonattainment areas. 42 U.S.C. §§ 7501–08. Thus, no regulations with respect to implementation plans under subchapter C or subchapter D (§§ 7501–08) can be promulgated without these designations.

**13.** Numerous pending challenges to the attainment designations were dropped as a result of the EPA's revision of the designations. *See Bethlehem Steel Co. v. EPA*, No. 78–1556 (7th Cir., Nov. 28, 1978); *Central Phosphate, Inc. v. Costle*, No. 78–1929 (5th Cir., Oct. 16, 1978); *CF Chemicals, Inc. v. Costle*, No. 78–1931 (5th Cir., Oct. 16, 1978); *Occidental Oil Shale, Inc.*

*v. EPA*, No. 78–1325 (10th Cir., Oct. 6, 1978); *National Zinc Co. v. EPA*, No. 78–1327 (10th Cir., Oct. 6, 1978); *Gulf Oil Corp. v. EPA*, No. 78–1323 (10th Cir., Oct. 6, 1978); *Board of County Comm'rs v. EPA*, No. 78–1326 (10th Cir., Oct. 6, 1978).

**14.** The two cases reaching contrary results and remanding these designations to the EPA for notice and comment prior to effective issuance neither mention nor apply the special review provisions of section 7607(d)(9)(D). *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979); *United States Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979). Since we believe this provision to be applicable and controlling, we reach a different result than these cases. See footnote 11 *supra*.

Control Division, Proposed Nonattainment Areas in Indiana: A Support Document, IV–183 (1977) [Pet. Appendix at 56]. Since monitors only indicate air quality at the monitoring site alone, modeling studies are necessary to extrapolate from the monitor data to determine air quality throughout a larger region. The use of such studies to assess air quality throughout wide regions has been approved in *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150, 1160–64 (6th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978).

The petitioners forward three arguments as to why this factual basis is insufficient to support the designation under review. First, they point out that the modeling studies were based on 1974 data and did not take into account any emission reductions that may have occurred since then. Second, the petitioners rely on their own modeling studies. Petitioner Youngstown cites its own study, prepared by Arthur D. Little, Inc., as allegedly supporting the conclusion that the major contributors to this high monitor reading were two oil refineries near the Hammond monitor and that other sources in the area are not major contributors. Petitioner United States Steel likewise claims that its own study, prepared for it by Equitable Environmental Health, concludes that the days on which violations were recorded at the Hammond monitor were days on which the prevailing wind direction would preclude any impact by the petitioner's source and that on the days that the wind would have permitted such an impact, no violations were recorded. Finally, the petitioners cite the conclusion of a subsidiary EPA official that data for the Lake County area was insufficient and that, pending more extensive studies, only the area directly around the Hammond monitor should be designated nonattainment.

We do not find these arguments to be a persuasive basis for overturning the designations. First, the petitioners' argument that the modeling was based on outdated data is not compelling. Any strength that it might have could only be based on petitioners' assertion that improvements in emissions have been effected since 1974.

There is, however, no support for this assertion in the record. Petitioners' comments on the proposed designations do not even make this assertion, much less provide any factual support for it. Indeed, the comments do not squarely raise the objection that the data is too old, and thus the petitioners are arguably precluded from raising this objection before this court. Finally, since the designation of an area as nonattainment triggers the requirement that the state engage in comprehensive current monitoring in order to define more precisely the attainment status of various regions, *see* 42 U.S.C. § 7502(b)(3), the use of three-year-old data to make this initial designation can hardly be said to be arbitrary or capricious.

Nor do we find that the petitioners' studies compel a different conclusion. The gist of these studies is that other sources were the principal contributors to the measured excesses. This argument assumes that the designation process is designed to define those areas in which the principal offending sources are contained. The statute does not expressly state the standards or methods by which areas are to be designated. Although one method would be to designate the areas containing the principal offenders as nonattainment, another approach would be to look simply at the expected air quality throughout a region and designate noncomplying areas, regardless of the origin of the noncompliance, as "nonattainment." The EPA has clearly adopted the latter approach. In its response to comments made before issuance of the final designations, the EPA stated:

The purpose of the designations is to identify air quality problem areas for which the States and EPA must seek solutions . . . .. The area designation . . . . thus does not in and by itself dictate the applicable new or existing source requirement. There are essentially three reasons for this.

First, because air pollution emissions are transported from one area to another, the sources that cause or contribute to a violation, or affect a clean locality, may

be in different locations from the violation or clean locality itself. Controls will therefore often have to apply to sources outside of the area that the controls are intended to protect.

Second, States may choose to impose requirements over a broader or narrower geographic region than the precise area where sources exist that directly contribute to particular concentrations of a pollutant. For example, for reasons of equity, simplicity of administration, or to allow more growth in clear areas, *states may choose to make their revised emission limitations applicable statewide, rather than restricting the requirement to sources that directly cause or contribute to violations.*

Finally, section 107(d) of the Act provides that attainment status designations were to be made within a very short time period, and were to be composed of air quality control regions (or portions thereof), which are often based on State, county, or other political jurisdictional boundaries. This process is bound to include pockets where the air quality does not correspond to the designation of the area. These anomalies can be taken into account in the more elaborate and thorough proceedings required under the Act for development of plans and issuance of individual permits.

48 Fed.Reg. 40413 (Sept. 11, 1978) (emphasis added).

The EPA specifically used this approach with respect to the designation at issue here. In reply to comments on the Lake County designation, the EPA stated:

Ten commentators requested revisions to the size of the sulfur dioxide ($SO_2$) primary nonattainment area in Lake County . . . . [E]ach commenter recommended that the city where the commenter was located be excluded from the nonattainment area . . . [because] most of the heavy industry in the area was not responsible for the violations which were monitored . . . . .

The northern portion of Lake County, Indiana, is heavily industrialized with a significant number of large $SO_2$ emission sources and relatively few continuous $SO_2$ monitors in operation. Despite the scarcity of the monitors, violations of the standard have been monitored. For this reason, the area must remain nonattainment for $SO_2$.

Clearly, therefore, the EPA treats the designation process as defining areas with problematic air quality and not merely pinpointing those areas which contain problematic sources. Since "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong," *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969), we must accept the EPA's interpretation of the designation process. Accordingly, the petitioners' contentions here that the problems of air quality found within Lake County may be traced to sources other than the petitioners and in a definable area are irrelevant to the designations adopted by the EPA. The monitored exceedances and the modeling studies demonstrated, and petitioners do not really contest, that the air quality in northern Lake County did not meet applicable standards, and that is sufficient to support the designations regardless of the source of the noncompliance.

The petitioners finally rely on the conclusion of an EPA employee to support their conclusion that a smaller area should have been designated nonattainment. Specifically petitioners cite a report by Gerald Regan, Chief of the Air Surveillance Branch for Region V of the EPA, made after reading the research study submitted by United States Steel discussed above and in which he recommended that the nonattainment designation be restricted to the "immediate vicinity" of the Hammond monitor. However, he also stated in this report that "it is probable that the primary $SO_2$ standard is being exceeded at locations other than the . . . [monitoring] site in Hammond." As we note above, those probable excesses are sufficient to support nonattainment designations, and thus any suggestion by Mr. Regan to limit the nonattainment area

must be based on the theory, which we have rejected, that the designation process is designed to pinpoint the principal offending sources. Therefore, nothing in this recommendation provides any reason to overturn the designations under review.

Accordingly, the petitions to set aside the § 7407(d) designations are denied.