REPUBLIC STEEL CORPORATION, United States Steel Corporation, General Motors Corporation, Ohio Edison Company, The B. F. Goodrich Company, The Goodyear Tire & Rubber Company, Shell Oil Company, The Dayton Power & Light Company, Petitioners,

v.

Douglas M. COSTLE, Administrator, and United States Environmental Protection Agency, Respondents.

Nos. 78–3204, 78–3643, 78–3202, 78–3620, 78–3199, 78–3642, 78–3205, 78–3638, 78–3206, 78–3640, 78–3207, 78–3639, 78–3641, 78–3201 and 78–3637.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1979.

Decided April 17, 1980.

Victor E. DeMarco, James C. Sennett, James L. Wamsley, III, Jones, Day, Reavis & Poque, Cleveland, Ohio, for petitioners in 78–3204 and 78–3643.

E. P. Weber, Jr., Republic Steel Corp., Cleveland, Ohio, for petitioners in 78–3204.

Ronald C. Hausmann, Environmental Protection Agency, Washington, D. C., for respondents in all cases.

Paul M. Kaplow, Pollution Control Section, Land & Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., Mary Ann Muirhead, EPA-Region V. Chicago, Ill., for respondents in all cases.

James C. Hagy, Cleveland, Ohio, for petitioners in 78–3643.

James Van Carson, William H. Baughman, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for petitioners in 78–3202 and 78–3620.

Louis E. Tosi, Toledo, Ohio, for petitioners in 78–3199, 78–3642, 78–3205, 78–3206, 78–3640, 78–3207 and 78–3641.

John P. Murtagh, Toledo, Ohio, for petitioners in 78–3199 and 78–3642.

Fuller, Henry, Hodge & Snyder, Toledo, Ohio, for petitioners in 78–3199, 78–3642, 78–3205, 78–3206, 78–3640, 78–3207, 78–3639, 78–3641 and 78–3637.

Julius J. Hollis, General Motors Corp., Detroit, Mich., for petitioners in 78–3199.

Leonard F. Charla, General Motors Corp., Detroit, Mich., for petitioners in 78–3199 and 78–3642.

Otis M. Smith, General Motors Corp., David W. Graves, Jr., Detroit, Mich., for petitioners in 78–3642.

C. Randolph Light, Toledo, Ohio, for petitioners in 78–3205, 78–3639, 78–3641 and 78–3637.

James C. Carroll, Ohio Edison Co., Akron, Ohio, for petitioners in 78–3205 and 78–3639.

Michael E. McConnell, Toledo, Ohio, for petitioners in 78–3206, 78–3640 and 78–3207.

Irving Harris, Cors, Hair & Harlsock, Cincinnati, Ohio, for intervenor Shell.

J. R. Newlin, Steven F. Koziar, The Dayton Power and Light Co., Dayton, Ohio, for petitioners in 78–3201 and 78–3637.

Before EDWARDS, Chief Judge, and PHILLIPS and PECK, Senior Circuit Judges.

EDWARDS, Chief Judge.

In this petition for review of the actions of the Administrator of the United States Environmental Protection Agency, Republic Steel Corporation and seven other major corporations [1] in Ohio attack the rules promulgated by the Agency under the Clean Air Act Amendments of 1977 to control sulfur dioxide ($SO_2$) in the ambient air of Ohio.

Each petitioner operates one or more plants in Ohio in an area which has been designated by EPA as a "nonattainment area." This term means, in the context of this case, that in the area concerned EPA had found the ambient air to contain $SO_2$ pollutants in excess of the National Ambient Air Quality Standards (NAAQS) set by federal law. Petitioners complained that the nonattainment designations were based upon illegal methodology which produced erroneous results. They also claim that these results will adversely affect them by making them subject to a prohibition on major new installations or additions to plants without offsetting $SO_2$ pollution reductions and that existing facilities would be required to make incremental reductions in $SO_2$ emissions yearly so as to achieve compliance with NAAQS by December 31, 1982.

The pollutant which is the subject of this litigation is sulfur dioxide emitted when industrial power plants or public utility plants burn high sulfur coal. Much prior legal history has been written in this Circuit concerning the efforts of the Congress of the United States to accomplish effective control of $SO_2$ pollution. *Buckeye Power, Inc. v. EPA*, 481 F.2d 162 (6th Cir. 1973) (*Buckeye Power I*); *Buckeye Power, Inc. v. EPA*, 525 F.2d 80 (6th Cir. 1975) (*Buckeye Power II*); *Northern Ohio Lung Ass'n v. EPA*, 572 F.2d 1143 (6th Cir. 1978); *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150 (6th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 278, 58 L.Ed.2d 256 (1978); and *Cincinnati Gas & Electric Co. v. EPA*, 578 F.2d 660 (6th Cir. 1978).

In our opinion in *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d at 1152, we gave the history of congressional action on this subject:

The United States Congress has been wrestling with the problem of pollution of the ambient air since 1955. *See* Act of July 14, 1955, Pub. L. No. 84–159, 69 Stat. 622. The original act has now been amended many times. It now is cited as the Clean Air Act and has been codified in 42 U.S.C. §§ 1857–1857*l* (1970 & Supp. V 1975).[2]

[2] The Clean Air Act was originally enacted in 1963, Pub. L. No. 88–206, 77 Stat. 392. It was amended in relatively minor ways three times during the following six years. Pub. L. No. 89–272, 79 Stat. 992 (1965); Pub. L. No. 89–675, 80 Stat. 954 (1966); Pub. L. 90–148, 81 Stat. 485 (1967).

The Act's present form, however, is derived from amendments adopted in 1970 and subsequently. Clean Air Act Amendments of 1970, Pub. L. No. 91–604, 84 Stat. 1676 *as amended*, Pub. L. No. 92–157, 85 Stat. 464 (1971); Pub. L. No. 93–319, 88 Stat. 246 (1974); Pub. L. No. 95–95, 91 Stat. 685 (1977).

The Act is being recodified as 42 U.S.C. §§ 7401–7626.

This is the sixth time this court has considered Ohio industry petitions for relief from the efforts of the United States EPA to move toward reductions of $SO_2$ pollution of the ambient air which Ohioans breathe.

1. General Motors Corp.; U. S. Steel Corp.; Ohio Edison Co.; B. F. Goodrich Co.; Goodyear Tire Co.; Shell Oil Co.; and Dayton Power & Light Co.

We have granted some delays and have remanded many fact problems for further consideration by the Agency with the result of a considerable number of adjustments designed to reduce industry costs without damaging the ultimate objectives of the National Clean Air Act.

### National Air Quality Standards for Sulfur Dioxide

In *Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d at 1153–54, this court described the setting of national air quality standards by Congress and the congressional objectives:

§ 50.4 **National primary ambient air-quality standards for sulfur oxides (sulfur dioxide).**

The national primary ambient air quality standards for sulfur oxides measured as sulfur dioxide by the reference method described in Appendix A to this part, or by an equivalent method, are:

(a) 80 micrograms per cubic meter (0.03 p.p.m.)—annual arithmetic mean.

(b) 365 micrograms per cubic meter (0.14 p.p.m.)—Maximum 24-hour concentration not to be exceeded more than once per year.

§ 50.5 **National secondary ambient air quality standards for sulfur oxides (sulfur dioxide).**

The national secondary ambient air quality standard for sulfur oxide measured as sulfur dioxide by the reference method described in Appendix A to this part, or by any equivalent method is 1,300 micrograms per cubic meter (0.5 p.p.m.) maximum 3-hour concentration not to be exceeded more than once per year.

Ambient Air Standards (Primary & Secondary), 40 C.F.R. §§ 50.4, 50.5 (1976) (Footnote omitted).

The federal Clean Air Act program which produced these standards is based primarily upon the adverse effect which air pollution has upon human life and health.

Acute episodes of high pollution have clearly resulted in mortality and morbidity. Often the effects of high pollutant concentrations in these episodes have been combined with other environmental features such as low temperatures or epidemic diseases (influenza) which may in themselves have serious or fatal consequences. This has sometimes made it difficult to determine to what extent pollution and temperature extremes are responsible for the effects. Nevertheless, there is now no longer any doubt that high levels of pollution sustained for periods of days can kill. Those aged 45 and over with chronic diseases, particularly of the lungs or heart, seem to be predominantly affected. In addition to these acute episodes, pollutants can attain daily levels which have been shown to have serious consequences to city dwellers.

\*    \*    \*    \*    \*    \*

There is a large and increasing body of evidence that significant health effects are produced by long-term exposures to air pollutants. Acute respiratory infections in children, chronic respiratory diseases in adults, and decreased levels of ventilatory lung function in both children and adults have been found to be related to concentrations of $SO_2$ and particulates, after apparently sufficient allowance has been made for such confounding variable as smoking and socioeconomic circumstances.

Rall, *Review of the Health Effects of Sulfur Oxides*, 8 Env'tal Health Perspectives 97, 99 (1974).

It appears that present national air quality standards have been set with little or no margin of safety. Adverse health effects are set forth in the two following charts; and the minimal or nonexistent margins of safety are vividly portrayed:

TABLE 1.—EFFECTS THRESHOLD, BEST CHOICE SIGNIFICANT RISK LEVELS AND SAFETY MARGINS CONTAINED IN PRIMARY AMBIENT AIR QUALITY STANDARDS

| Pollutant | Lowest best judgment estimate for effects threshold and best choice for significant risk levels | | Adverse health effect | U.S. primary air quality standard | Margin of safety* (percent) |
| --- | --- | --- | --- | --- | --- |
| | Concentration | Averaging time | | | |
| Sulfur dioxide | 300 to 400 ug/m³ | 24 hour | Mortality increase | 365 ug/m³ | None |
| | 91 ug/m³ | Annual | Increased frequency of acute respiratory disease | 80 ug/m³ | 14 |
| Total suspended particulates | 250 to 300 ug/m³ | 24 hour | Mortality increase | 260 ug/m³ | None |
| | 70 to 250 ug/m³ | do | Aggravation of respiratory disease | 260 ug/m³ | None |
| | 100 ug/m³ | Annual | Increased frequency of chronic bronchitis | 75 ug/m³ | 33 |
| Suspended sulfates | 10 ug/m³ | 24 hour | Increased infections in asthmatics | None | None |
| | 15 ug/m³ | Annual | Increased lower respiratory infections in children | None | None |
| Nitrogen dioxide | 140 ug/m³ | do | Increased severity of acute respiratory illness in children | 100 ug/m³ | 40 |
| Carbon monoxide | 23 ug/m³ | 8 hour | Diminished exercise tolerance in heart patients | 10 ug/m³ | **130 |
| | 73 ug/m³ | 1 hour | Diminished exercise tolerance in heart patients | 40 ug/m³ | **82 |
| Photochemical oxidants | 200 ug/m³ | do | Increased susceptibility to infection | 160 ug/m³ | 25 |

* Safety margin equals effects threshold minus standard divided by standard X 100.
** Safety margins based upon carboxyhemoglobin levels would be 100 percent for the 8 hour standard and 67 percent for the 1 hour standard.

TABLE 2.—THRESHOLD AND ILLUSTRATIVE HEALTH RISKS FOR SELECTED AMBIENT LEVELS OF SUSPENDED SULFATES

| Adverse health effect | Threshold concentration and exposure duration | Illustrative health risk | | |
| --- | --- | --- | --- | --- |
| | | Definition | Level | Sulfur dioxide equivalent |
| Increase in daily mortality | 25 ug/m³ for 24 hr or longer | 2½ percent increase in daily mortality | 38 ug/m³ for 24 hr | 600 ug/m³ for 24 hr. |
| Aggravation of heart and lung disease in the elderly | 9 ug/m³ for 24 hr or longer | 50 per cent increase in symptom aggravation | 48 ug/m³ for 24 hr | 750 ug/m³ for 24 hr. |
| Aggravation of asthma | 6 to 10 ug/m³ for 24 hr | 75 percent increase in frequency of asthma attacks | 30 ug/m³ for 24 hr | 450 ug/m³ for 24 hr. |
| Excess acute lower respiratory disease in children | 13 ug/m³ for several yr | 50 percent increase in frequency | 20 ug/m³ annual average | 100 to 250 ug/m³ annual average. |
| Excess risk for chronic bronchitis | 10 to 15 ug/m³ for up to 10 yr | 50 percent increase in risk | 15 to 20 ug/m³ annual average | 100 to 250 ug/m³ annual average. |

120 CONG. REC. 18973 (1974) (report of Drs. Finklea, Hammer & Cole).

We emphasize that this court is not engaged in setting air quality standards nor are they in dispute in this litigation. On April 30, 1971, acting under the 1970 amendments, the Administrator issued national primary and secondary ambient air quality standards. This court's examination of them in the preceding ambient air $SO_2$ cases served to convince this court that the NAAQS as set by the Agency under Congressional authorization allowed little if any margin for error without proximate damage to at least the sick, the aged and the infant population of the area affected. *See Cleveland Electric Illuminating Co. v. EPA, supra.*

During Congress' consideration of the Clean Air Quality Amendments of 1977, it is clear that the National Air Quality Standards were not under any serious attack because of claims of excess stringency. On the contrary, Congress' concerns in 1977 were that, even with achievement, statutorily allowable air pollution from such pollutants as $SO_2$ might damage the nation's health. The Legislative History of the 1977 Act contains this significant paragraph:

The beneficial health impact of the ambient standards has been recognized by the American Medical Association and the American Lung Association in testimony before the subcommittee and in resolutions urging no delays or relaxation in meeting these standards. Even more graphically, two recent studies show that a significant decrease in the number of deaths can result from improving air quality to the level of the national primary ambient air quality standards.

Thus, there can be no question that the national ambient air quality standards are necessary and beneficial for protection of the healthy and reduction of risk to the susceptible and chronically ill. However, it is also clear that a combination of ambient standards with a policy for prevention of significant deterioration of air quality is necessary to provide for maximum feasible protection of the public health. Since 1971 when the national ambient air quality standards were set, new and disturbing information has come to light showing that the public's health is being harmed to some extent, perhaps seriously, even at levels below the national standards. The margins of safety, supposedly insured by the standards, seem to have vanished in the face of new data.

The inadequacies of the standards are substantial both with regard to the pollutants which are regulated and with respect to their failure to regulate others. A summary of the shortcomings and limitations of the existing national primary ambient air quality standards demonstrates this.

Moreover, the adverse health effects to which EPA refers are not limited to minor problems such as eye irritation or occasional cough. According to EPA, independent studies "indicated that deaths are occurring at pollution levels not far above the primary [24-hour $SO_2$] standard".

Newly considered circumstances and studies indicate that the required margin of safety is probably nonexistent, not merely small, under some circumstances or with respect to some pollutants.

We turn now to the two issues of this case. We are not asked to decide in this case any fact issues wherein any petitions or petitioners contend that they have shown or can show that the results of the disputed EPA rule or application thereof would be to exceed in stringency national air quality standards for a particular county or area of a county. Four such cases have been argued to this panel and will be decided subsequently. In this case, petitioners levy general attacks upon EPA's procedure and methodology for determining attainment and nonattainment areas.

### Petitioners' Issues

First, petitioners assert that EPA failed without good cause to satisfy the notice and comment requirements of the Administrative Procedures Act for informal rulemaking and that therefore, its designation of Ohio's nonattainment areas should be set aside.

Second, the petitioning industries allege that the models used by EPA for determining nonattainment were employed arbitrarily and capriciously and assert that this is particularly true since EPA, they claim, disregarded reliable monitoring data showing actual air quality.

### The Procedural Issue

As to the first issue in this case, EPA admits that it did not give prior public notice, hold hearings or solicit public comment as normally required by rulemaking under the Administrative Procedures Act, 5 U.S.C. §§ 553(b)–553(c) (1976) before issuing the list of designations of attainment and nonattainment areas. Its reliance for these omissions is upon the good cause exception contained in the Administrative Procedures Act, 5 U.S.C. § 553(b)(B) which reads:

"Except when notice or hearing is required by statute, this subsection does not apply—

\*    \*    \*    \*    \*    \*

When the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary or contrary to the public interest."

The finding and brief statement of reasons referred to above as prepared by EPA follows:

The States are now preparing revisions to their State implementation plans (SIPs) as required by sections 110(a)(2)(I) and 172 of the Act. This enterprise, which must be completed by January 1, 1979, requires that the States have immediate guidance as to the attainment status of the area designated under section 107(d). Congress has acknowledged this by imposing a tight schedule on the designation process and requiring EPA to promulgate the list within 180 days of the enactment of the amendments. Under these circumstances it would be impracticable and contrary to the public interest to ignore the statutory schedule and postpone publishing these regulations until notice and comment can be effectuated.

For this good cause, the Administrator has made these designations immediately effective.

The Agency recognized, however, the importance of public involvement in the designation process. It is therefore, soliciting public comments on this rule by May 2, 1978. Comments received will be considered carefully and revisions to the designations will be made where appropriate. Rec.Doc.No. 1, App. at 6.

Petitioners, however, contend that the January 1, 1979 date could not have been achieved anyhow and should not have been treated as mandatory. They also argue that opportunity to comment in advance of EPA's taking a public position is much more valuable than being allowed to do so afterward.

■ We believe the Administrator acted consistently with the good cause exception in the Administrative Procedures Act for at least the following reasons:

First, Congress had confronted him with the second of two mandatory attainment dates for national air quality standards for sulfur dioxide and it was obvious that the January 1, 1979, date could not be achieved if notice and comment procedures were allowed in advance. It would, indeed, have been "impracticable" to ignore the January 1, 1979, date.

Second, the Administrator was not dealing with the $SO_2$ problem in Ohio for the first time. As noted above, every EPA move toward reducing $SO_2$ pollution in the ambient air of Ohio has been met with immediate and repetitive protest and litigation. The Administrator had every reason to contemplate a continuation of the record already recited above.

Third, contrary to the argument advanced by petitioners the Administrator could not comfortably rely upon the Ohio EPA's designation of attainment and nonattainment areas since experience had taught that the Ohio EPA was much more concerned with industry interests than those of the general public. *See Cleveland Electric Illuminating Co. v. EPA*, 572 F.2d 1150, 1156–57 (6th Cir. 1978).

Fourth, we agree with the Administrator that it would have been "contrary to the public interest to ignore the statutory schedule." Important as are the economic arguments against $SO_2$ control which are now presented for a sixth time to this court, the effect of continued lack of control of $SO_2$ emissions must be held, as Congress clearly intended, to outweigh them.

Fifth, this record indicates that EPA did give serious consideration to the industry comments received in the post promulgation period and made 36 changes or modifications in the previously announced designations.

Under these circumstances, we think that the Administrator's solution of promulgating a schedule of nonattainment areas and subsequently receiving objections and comment, and thereafter effecting such changes as were required, was a reasonable approach consistent with the Administrative Procedures Act. We recognize, of course, petitioners cite and rely on *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 171 (6th Cir. 1973), as contrary authority. They also rely similarly upon *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3rd Cir. 1979), and upon *United States Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir.), *clarified on rehearing*, 598 F.2d 915 (5th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

In turn, EPA cites and relies upon a Seventh Circuit case, *United States Steel Corp. v. EPA*, 605 F.2d 283 (7th Cir. 1979), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980); and upon this circuit's recent opinions in *Cleveland Electric Illuminating Co. v. EPA, supra*, and *Cincinnati Gas & Electric Co. v. EPA, supra*.

This court, of course, has no doubt about the applicability of the Administrative Procedures Act to the United States EPA. This we made clear in the first of this series of cases in *Buckeye Power, Inc. v. EPA*, 481 F.2d 162, 170–71 (6th Cir. 1973). In *Buckeye Power* I, however, this court did not have before it detailed knowledge of the long delays in implementation which is present in this case and had no occasion to discuss the good cause exception relied upon by the Administrator in this case.

As to *Sharon Steel Corp., supra*, and *U.S. Steel, supra*, we find ourselves in disagreement concerning the applicability of the good cause exception. Both the Third and Fifth Circuit opinions appear to us to ignore the sense of urgency which characterized the Congressional debate preceding the passage of the Clean Air Act Amendments of 1977. Additionally, we would wish to be somewhat more sensitive to the "public interest" in achievement of national air quality standards. If the circumstances of this case do not justify employment of the good cause exception, we will be hard put to find any justification for its use. Past experience has taught this court that remand means an additional two-year delay in achieving national air quality standards in Ohio.

For reasons previously spelled out in this opinion, we find ourselves in agreement with the Seventh Circuit in *U.S. Steel v. EPA, supra*, where Judge Sprecher said for that court:

Turning first to whether the agency action here was justified under the narrower (b)(B) standard, we find that such justification existed under the impracticability standard embodied in the statutory language of the first good cause exception. The legislative history of this impracticability standard reveals that Congress intended this exemption to operate when the regular course of rulemaking procedure would interfere with the agency's ability to perform its functions within the time constraints imposed by Congress. Early versions of this provision allowed public participation to be dropped where it was "impracticable because of unavoidable lack of time or other emergency." S. Doc. No. 248, 79th Cong., 2d Sess. 140, 148, 157 (1946). The exception was broadened by the elimination of this qualifying language. The Senate and House Reports interpreted "impracticable" in this broader formulation as a situation "in which the due and required execution of the agency functions would

be prevented by its undertaking public rule-making proceedings." *Id.* at 200, 258.[2]

### The Modeling Issue

In their second issue petitioners attack the substance of the regulations designating sulfur dioxide attainment areas and make essentially two claims which are closely related. The first is that the use of modeling based upon full capacity operational data of all emissions sources in a given area on a hypothetical second worst day in the year assumption is arbitrary and capricious in itself. This same argument, applicable of course to single emission sources, was made and squarely rejected by this court in *Cleveland Electric Illuminating Co. v. EPA, supra* and our *Cincinnati Gas & Electric v. EPA, supra,* opinions. We reject this argument as a thinly disguised, belated motion for rehearing.

Additionally, petitioners assert that in all such nonattainment designations, EPA arbitrarily and capriciously paid no attention to or too little attention to actual air quality as shown on monitors. This last argument has also been made to this court in *Cleveland Electric Illuminating Co.* and *Cincinnati Gas & Electric* cases and rejected in those cases as to the monitoring systems there and then in place.

Theoretically, of course, actual air quality tests would have to be superior to modeling assumptions if there were sufficient monitors to constitute a fair test of the ambient air in a county. How many such monitors would be needed for a meaningful sample of the ambient air of a county cannot be deduced from this record.

Congress has recognized that EPA may employ either monitoring or modeling. In § 171(2) of the Act, a nonattainment area is defined as "an area which is shown by monitored data or which is calculated by air quality modeling . . . to exceed any national ambient air quality standard." § 171(2), 42 U.S.C. § 7501(2).

Where Congress has itself described two alternative methods for EPA to determine nonattainment, the decision as to which to employ is certainly not initially one for this court. Our review concerns whether there has been a violation of law and if not, whether the EPA decision can appropriately be termed arbitrary and capricious.

In *Cleveland Electric Illuminating Co. v. EPA, supra,* we described one of the two models employed by EPA:

The RAM model is a general formula which can be applied to many individual sources of pollution to derive specific estimates of $SO_2$ emission rates for each. It employs a wider, more complete and more accurate data base than any prior model yet employed in devising a sulfur dioxide control strategy for a state or county. The crucial data with which the RAM model starts are the design capacity figure, plus the fuel sulfur content, from which is computed the $SO_2$ emission rate for each of the heating or power plants sought to be controlled. Thus at the outset the RAM model starts with ascertainable specific figures for each source where disputes can be resolved by inspection of the equipment or fuel concerned. Many of the additional components such as stack height, wind direction, physical relationship of sources to each other, and topography of the area are similarly ascertainable as matters of fact. With the enormous financial stakes involved in this litigation, every effort to avoid disputes about the accuracy of the data base should be made. This record shows that United States EPA's design of the RAM model was brought about at least in large

---

2. The Seventh Circuit also cited § 307(d)(9) of the Clean Air Act of 1970 which provides in applicable part: "in the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be (d) within observance of procedure required by law only if [the procedural errors] were so serious and related to

matters of such central relevance to the rule that there is substantial likelihood that the rule would have been significantly changed if such errors had been made."

We would be inclined to rely upon this reasoning also if the Administrator had exercised the powers granted him by 42 U.S.C. § 7607(d)(1)(N) (1976).

part by Ohio industry's requests for greater specificity and hence lower costs of compliance with National Air Quality Standards.

While there may yet be developed (and hopefully will be) a better method of establishing a control strategy for sulfur dioxide emissions than the RAM model, no one has yet come forward with such. Nor do petitioners point to any such.

This is not to ignore that petitioners do cite Enviroplan's claims of a superior model termed Air Pollution Evaluation System. This record shows, however, that United States EPA asked for the Enviroplan model and was refused, and is now refused the operative details of that model on the grounds of proprietary interest. While such withholding may be both defensible as a matter of law and understandable as a matter of economics, this court cannot consider Enviroplan's model as available technology until and unless it is fully disclosed and evaluated by United States EPA—the agency charged ·by Congress with making these decisions.

We recognize that this record does not present positive proofs of the accuracy of RAM's predictions. Thus far technology has not developed foolproof methods for validating predictions concerning pollution of the ambient air absent years of collection of monitoring data with far more monitors and far more personnel than have thus far been available.

572 F.2d at 1162–63.

The conclusions arrived at in *Cleveland Electric Illuminating Co. v. EPA* quoted above are generally applicable to the present cases.

We emphasize again that in these cases we are dealing only with general objections to the procedures and formulae employed by EPA in devising its Ohio $SO_2$ control strategy. We reserve for later decision those attacks upon specific nonattainment designations wherein petitioners assert that the agency has made specific mistakes or arrived at results claimed to be demonstrably erroneous.

For the reasons outlined above, the petitions for review described above are hereby dismissed.