626 F.2d 1038
 15 ERC 2238, 200 U.S.App.D.C. 174, 10
Envtl. L. Rep. 20,963
 STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION,
Petitioner,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Douglas M.
Costle, Administrator, Respondents,
State of Missouri, Environmental Improvement Division of the
New Mexico Health and Environment Department, Department of
Pollution Control and Ecology of the State of Arkansas,
Department of Environmental Quality Engineering of the
Commonwealth of Massachusetts, District of Columbia, State
of Maine, W. Edward Wood, Director of Department of
Environmental Management of the State of Rhode Island and
Providence Plantations, Peter A. A. Berle, Commissioner of
Environmental Conservation of the State of New York, State
of Connecticut Department of Environmental Protection, The
Agency of Environmental Conservation of the State of
Vermont, State of Georgia, Department of Natural Resources,
Division of Environmental Protection, City of New York, Intervenors.
 No. 78-1392.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 14, 1980.
Decided June 30, 1980.
 
 Richard M. Hluchan, Deputy Atty. Gen., State of New Jersey, Trenton, N. J., for petitioner.
 Ronald C. Hausmann, Atty., Dept. of Justice, Washington, D. C., with whom, James W. Moorman, Asst. Atty. Gen., Angus MacBeth, Deputy Asst. Atty. Gen., Donald Stever, Atty., Dept. of Justice, Washington, D. C., were on brief, for respondent.
 
 
 1
 David L. Williams, Asst. Atty. Gen., State of Arkansas, Little Rock, Ark., was on brief, for intervenor, Department of Pollution Control and Ecology, State of Arkansas.
 
 
 2
 Dan Summers, Asst. Atty. Gen., State of Missouri, Jefferson City, Mo., was on brief, for intervenor, State of Missouri.
 
 
 3
 Arthur K. Bolton, Atty. Gen., and Sarah Evans Lockwood, Staff Asst. Atty. Gen., State of Georgia, Atlanta, Ga., were on brief, for intervenor, State of Georgia, Department of Natural Resources, Division of Environmental Protection.
 
 
 4
 Francis X. Bellotti, Atty. Gen., and Francis S. Wright, Asst. Atty. Gen., State of Massachusetts, Boston, Mass., were on brief, for intervenor, The Department of Environmental Quality Engineering of the Commonwealth of Massachusetts.
 
 
 5
 James A. Sevinsky, Albany, N. Y., was on brief, for intervenor, Peter A. A. Berle, Commissioner of Environmental Conservation of the State of New York.
 
 
 6
 Richard F. Webb, Asst. Atty. Gen., State of Connecticut, Hartford, Conn., was on brief, for intervenor, State of Connecticut Department of Environmental Protection.
 
 
 7
 Gregory W. Sample, Asst. Atty. Gen., State of Maine, Augusta, Me., was on brief, for intervenor, State of Maine. Donald G. Alexander, Augusta, Me., also entered an appearance for intervenor, State of Maine.
 
 
 8
 R. Daniel Prentiss, Providence, R. I., was on brief, for intervenor, State of Rhode Island Department of Environmental Management.
 
 
 9
 Benson D. Scotch, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., was on brief, for intervenor, Agency of Environmental Conservation of the State of Vermont.
 
 
 10
 James G. Greilsheimer, First Asst. Corp. Counsel, City of New York, New York City, was on brief, for intervenor, City of New York.
 
 
 11
 Judith W. Rogers, Corp. Counsel, John C. Salyer and Richard G. Wise, Asst. Corp. Counsel, Washington, D. C., entered appearances for intervenor, District of Columbia.
 
 
 12
 Leonard J. Theberge, Washington, D. C., entered an appearance, for intervenor, Mid Atlantic Legal Foundation.
 
 
 13
 Before McGOWAN and WILKEY, Circuit Judges, and DAVIES,* United States District Judge for the District of North Dakota.
 
 
 14
 Opinion for the court filed by Circuit Judge McGOWAN.
 
 McGOWAN, Circuit Judge:
 
 15
 We review here a rule promulgated by the Administrator of the Environmental Protection Agency under section 7407(d) of the Clean Air Act. Because the Administrator felt that a tight statutory schedule gave him "good cause" to do so, he promulgated that rule without the prior notice and without the prior solicitation of public comments which section 553 of the Administrative Procedure Act ordinarily requires. Because we find that the Clean Air Act's schedule for promulgation of the rule did not place such time constraints on the Administrator that notice and comment rule-making would have been impracticable, we hold he erred in invoking the good cause exception. We therefore reverse the Administrator and remand the record for further proceedings.
 
 
 16
 * In 1955, Congress passed the original Clean Air Act; in 1970 and 1977 Congress passed major amendments to that Act.[1] The Clean Air Act, 42 U.S.C. 7401 et seq.. (Supp. I 1977), now stands as an emphatic expression of Congress's intent that the air Americans breathe be clean.
 
 
 17
 On November 25, 1971, the Administrator of the Environmental Protection Agency (EPA), in obedience to the command of the Clean Air Act, promulgated "National Ambient Air Quality Standards" for several pollutants, including a pollutant variously referred to as photochemical oxidants or ozone. 36 Fed.Reg. 22384 (Nov. 25, 1971), 40 C.F.R. Part 50. In 1970, Congress had expected that these standards would be met by the middle of the decade. However, by 1975 Congress apprehended that that expectation would go unrealized in many areas. Congress viewed this failure with the utmost seriousness, for it understood that the "non-attainment of air quality standards in a wide and densely populated region could result in a phenomenal health impact, measured in terms of millions of days of aggravated disease, asthma attacks and lower respiratory disease episodes." H.Rep. No. 95-294, 95th Cong., 1st Sess. 209 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1288.
 
 
 18
 Fearing for the health of "tens of millions," id., Congress imposed a new, and tight, schedule for achieving the air quality standards the Administrator had set in 1971. The part of the new schedule relevant to our task was 42 U.S.C. § 7407(d), which required states to submit to the Administrator a list of (1) those air-quality-control regions (to be designated "attainment") which, on August 7, 1977, met the national air quality standards, (2) those regions (to be designated "nonattainment") which did not meet the standards, and (3) those regions (to be designated "unclassifiable") for which there were insufficient data to permit classification. This list was to be submitted "within one hundred and twenty days after August 7, 1977," that is, on December 5, 1977. Within sixty days thereafter by February 3, 1978 the Administrator was directed to "promulgate each such list with such modifications as he deems necessary."
 
 
 19
 Using the Administrator's modified list, each state was to formulate by January 1, 1979, plans for the "implementation, maintenance, and enforcement" of air quality standards. A "state implementation plan" for oxidants was to be written which would assure that air quality standards would be reached by December 31, 1982. 42 U.S.C. § 7502(a)(1) (Supp. I 1977). Of necessity, therefore, plans would impose much more stringent measures for areas designated "nonattainment" than for areas not so designated. By July 1, 1979, the Administrator was to have approved or disapproved state plans. If a state failed to secure approval for a plan for dealing with regions designated "nonattainment," the statute forbad the construction or modification of any major stationary source of pollution in those regions when "the emissions from such facility will cause or contribute to concentrations of any pollutant for which (an air quality standard) is exceeded in such area . . . ." 42 U.S.C. § 7410(a)(2)(I) (Supp. I 1977).
 
 
 20
 Although the statute required the Administrator to promulgate a list of nonattainment areas on February 3, 1978, he in fact promulgated it on March 3, 1978. 43 Fed.Reg. 8962. And although section 553 of the Administrative Procedure Act (APA) requires that, when an agency proposes to issue a rule, it must first publish a general notice in the Federal Register, 5 U.S.C. § 553(b), and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," 5 U.S.C. § 553(c), the Administrator provided neither notice nor opportunity for comment. Instead, his "final rule" was effective "immediately." 43 Fed.Reg. 8962 (March 3, 1978). In justification, he invoked the exception to the usual requirement of notice and comment rule-making which section 553(b)(B) creates for those occasions "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The Administrator explained that the tight schedule Congress had set prevented notice and comment rule-making:
 
 
 21
 The States are now preparing revisions to their State implementation plans (SIPs) as required by sections 110(a)(2)(I) and 172 of the Act. This enterprise, which must be completed by January 1, 1979, requires that the States have immediate guidance as to the attainment status of the areas designated under section 107(d). Congress has acknowledged this by imposing a tight schedule on the designation process and requiring EPA to promulgate the list within 180 days of the enactment of the amendments. Under these circumstances it would be impracticable and contrary to the public interest to ignore the statutory schedule and postpone publishing these regulations until notice and comment can be effectuated. For this good cause, the Administrator has made these designations immediately effective.
 
 
 22
 43 Fed.Reg. 8962 (March 3, 1978). However, the Administrator did offer to receive post hoc public comment:
 
 
 23
 The Agency recognizes . . . the importance of public involvement in the designation process. It is(,) therefore, soliciting public comment on this rule by May 2, 1978.
 
 
 24
 Id.
 
 
 25
 In his list (i. e., in the rule we now review), the Administrator designated "over 600" of the 3,044 counties in the country as "nonattainment" for photochemical oxidant pollution. (The EPA represents that this figure was later decreased when, on January 29, 1979, the Administrator adjusted the national standard for oxidant pollution by increasing the permissible proportion of it from .08 parts per million to .12 parts per million.) Most counties in the industrial Northeast and in western California were designated nonattainment for oxidant pollution; little of the rest of the country was. J.A. at 132a. In its brief, though, the EPA argues that "(a)pproximately 71% of all precursor sources and 79% of the stationary sources (of oxidant pollution) are situated in counties designated nonattainment." Respondents' Brief at 9.
 
 
 26
 On April 28, 1978 and thus within the 60 days allotted by the Administrator for comments the State of New Jersey wrote the Administrator to protest his analysis of the way oxidants are formed, the time they persist in the atmosphere, the distances they travel, the ways they should be measured, and the degree of their ubiquity:
 
 
 27
 Ozone air pollution is widespread; certain meteorological conditions carry it over wide areas of the country at levels above the Federal health standard. As these ozone-laden air masses move across the United States, every area, rural or urban, is likely to violate the ozone standard. Moreover, sources everywhere contribute ozone generating ingredients to the air mass exacerbating the problem.
 
 
 28
 J.A. at 246a. New Jersey thus asked the Administrator to "change your designations and policies in such a way as to require all states to establish control regulations for the ingredients to ozone formulation." Id. at 247a.
 
 
 29
 On May 2, 1978, New Jersey petitioned this court for review of the Administrator's rule. Since that time, the States of Maine, Connecticut, Massachusetts, New York, Rhode Island, and Vermont, the District of Columbia, and the City of New York have intervened in favor of petitioner New Jersey, and the States of Georgia, Arkansas, Missouri, and New Mexico have intervened in favor of the respondents (the EPA and its Administrator).[2]
 
 
 30
 On July 7, 1978, New Jersey supplemented its submission to the EPA. On January 26, 1979, however, the Administrator affirmed the controverted designations and briefly responded to New Jersey's comments. 44 Fed.Reg. 6395 (Feb. 1, 1979). (It will be recalled that, three days later, the Administrator increased the permissible level of oxidant pollution. See text at 1041 supra.) Finally, in "January 1979" the EPA published a "Technical Support Document for Agency Policy Concerning Designation of Attainment, Unclassifiable, and Nonattainment Areas for Ozone." J.A. at 358a-399a.
 
 II
 
 31
 In its brief, New Jersey argues that the Administrator's oxidant designations of "nonattainment" and "unclassifiable" are invalid because (1) they were issued without notice-and-comment rule-making and (2) they are arbitrary, capricious, and without adequate basis in the record. At oral argument, however, counsel for New Jersey bowed to the deference which, as a legal and practical matter, this court must pay the EPA's technical expertise and conceded that, in the present circumstances of this case, we could not properly invalidate the rule on the state's second ground. In any event, we find New Jersey's first argument persuasive and consequently need not reach the second.
 
 
 32
 We begin our discussion of the propriety of the Administrator's invocation of the good-cause exception embodied in section 553(b)(B) by outlining the reasoning of the four Circuits which recently reviewed other aspects of the same rule, two of which reversed the EPA, and two of which upheld it. In the first of these cases United States Steel Corp. v. EPA, 595 F.2d 207 (1979), the Fifth Circuit held that the Administrator erred in dispensing with section 553's notice and comment. To the agency's avowal that that omission was justified by the schedule under which it labored, the court, citing American Iron & Steel Institute v. EPA, 568 F.2d 284, 292 (3d Cir. 1977), and Shell Oil Co. v. FEA, 527 F.2d 1243, 1248 (Em.App.1975), responded, "(T)he mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception." 595 F.2d at 213. Nor was the court convinced by the Administrator's claim that the requisite "good cause" lay in his need to furnish the states guidance in formulating their implementation plans, since, the court pointed out, the Administrator could "at least have published a state's list as a proposed rule and then have accepted comments on it." 595 F.2d at 213. Because we find persuasive and adopt the Fifth Circuit's reasoning in this respect, we quote it at length:
 
 
 33
 First, the respective states already had most of the information contained in the EPA's designations, since those designations were based on submissions by the states. The statute indicates that the EPA's role is limited to reviewing the state designations and modifying them where necessary. 42 U.S.C. § 7407(d) (2). The states could have begun the revisions with the information on hand, changing them later as required by EPA alterations of the § 7407(d) list.
 
 
 34
 Furthermore, the EPA undercuts its own argument on this point by repeatedly emphasizing elsewhere the preliminary nature of the § 7407(d) designations in the entire process. The designations had little legal effect on the states; rather they were important in guiding the S(tate) I(mplementation) P(lan) revisions. The same guidance that was accomplished by the EPA's procedures could have been accomplished by issuing a proposed list in March, followed by final promulgation after notice and comment.
 
 
 35
 595 F.2d at 214.
 
 
 36
 In Sharon Steel Corp. v. EPA, 597 F.2d 377 (3d Cir. 1979), the Third Circuit opened its discussion of the "good cause" exception by commenting that, when Congress passed the Clean Air Act Amendments of 1977,
 
 
 37
 the circumstances that the Administrator advances as good cause should have been apparent. Nonetheless, Congress nowhere recorded any express indication that the 1977 amendments should relieve the Administrator from the ordinary procedures set forth in the APA for rule-making.
 
 
 38
 597 F.2d at 380. In any event, the court continued, since the Administrator modified the designations submitted by the states only when they were clearly incorrect, the Administrator could simply have published as proposed rules the state designations shortly after he received them. Under the circumstances of Sharon Steel, the notice and comment period would have ended by January 15, 1978. Had the Administrator then taken ninety days to review those comments, a final rule could have issued April 15, 1978, giving the states time to draft their plans before the January 1, 1979, deadline.[3] Although this would have given the states about a month less time than they were actually given, the time would have sufficed because of two improvements of the court's procedure over the one the Administrator used:
 
 
 39
 First, the states would then have known with certainty the content of the final rule, but under the procedure used by the Administrator the final rule issued March 3 was subject to change after a sixty-day period for comments following promulgation. Second, because the Administrator was largely fashioning his own designations according to the designations submitted by the states, the states (on the assumption they knew of this fact) could have begun as early as December 5 to draft their plans for attaining the national standards.
 
 
 40
 597 F.2d at 380.
 
 
 41
 In United States Steel Corp. v. EPA, 605 F.2d 283 (7th Cir. 1979), the Seventh Circuit rejected the reasoning and result of the Third and Fifth Circuits. (Since there are among our four precedents two cases denominated U. S. Steel v. EPA, we shall call these cases by the names of the courts which decided them.) The Seventh Circuit's starting point was a portion of the language which we quote in extenso below from the Senate and House Reports on the APA. See text at 1046 infra. That language interpreted the word "impracticable" as applying to situations "in which the due and required execution of the agency functions would be (unavoidably) prevented by its undertaking public rule-making proceedings."[4] S.Doc. No. 248, 79th Cong., 2d Sess. 200, 258 (1946), quoted in 605 F.2d at 287. The court then cited two cases for the proposition that "the 'good cause' exception may be utilized to comply with the rigors of a tight statutory schedule."[5] 605 F.2d at 287. The court next set about to show that the EPA's was such a schedule: The EPA had been given sixty days after the deadline for state lists to promulgate its rule, the states had been given eleven months for the "time-consuming process" of producing implementation plans, and the failure of some states to submit their lists on time further constricted the schedule. The court calculated that, "(a)dding one month for comment and four months to review and respond to these comments, compliance with notice and comment procedures would have delayed promulgation by five months or more, leaving the states with less than 6 months to formulate implementation plans." 605 F.2d at 288 (footnote omitted).
 
 
 42
 The final element in the Seventh Circuit's approval of the EPA's reliance on the good-cause exception was the Circuit's caustic reminder that the recalcitrance of the steel industry in general and of United States Steel in particular had been conspicuous among the reasons Congress imposed a tight schedule in the Clean Air Act Amendments of 1977. In a lengthy footnote, the court quoted "(t)he only specific example of nonattainment given by the House Report":
 
 
 43
 The committee is also mindful of the fact that several categories of major polluters have not complied with emissions limits in nonattainment areas. The 1975 subcommittee hearings reflect this disturbingly high incidence of noncompliance. In particular, the following testimony is of great concern:
 
 
 44
 Mr. ROGERS. Let's see, we have had the law 5 years now. Could you tell me company by company, how many of your plants are in compliance presently and how many are not?
 
 
 45
 Mr. ARMOUR (Interlake, Inc.). I think we have to define in compliance with what.
 
 
 46
 Mr. ROGERS. The Clean Air Act?
 
 
 47
 Mr. ARMOUR. We do not have any in compliance.
 
 
 48
 Mr. ANDERSON (Bethlehem Steel Corp.). None.
 
 
 49
 Mr. JAICKS (Inland Steel Co.). None.
 
 
 50
 Mr. MALLICK (U.S. Steel Co.). None.
 
 
 51
 Mr. TUCKER (National Steel Corp.). We have no plants in compliance.
 
 
 52
 Mr. JAICKS. It sounds terrible. But these are hard value money expenditures.
 
 
 53
 H.Rep. No. 294, 95th Cong., 1st Sess. 210-11 (1977), quoted in 605 F.2d at 287-88 n.5. Thus the court said, "Given that the strict deadlines were intended to force compliance by U.S. Steel and others, we are hesitant to allow U.S. Steel to again delay compliance through its procedural challenges." 605 F.2d at 288 n.5.
 
 
 54
 The Seventh Circuit's panel did not depend solely on its holding that the Administrator had properly invoked the good-cause exception of subsection 553(b)(B).[6] The first of its two other holdings rested on the "good cause" exception embodied in subsection 553(d)(3). Saying that "there is sound reason to believe that 'good cause' should encompass more situations in (d)(3) than in (b)(B)," 605 F.2d at 290, the court readily concluded that, a fortiori, (d)(3) permitted the Administrator to dispense with notice-and-comment rule-making. The court's second alternative holding was that, under its reading of subsection 7607(d)(9) of the Clean Air Act, it could reverse the Administrator on procedural grounds only where the procedural error (1) was arbitrary or capricious, (2) had been protested during the period for public comment, and (3) was so serious and was related to matters so central to the rule that, but for the error, there would be a substantial likelihood that the rule would have been significantly changed. The court decided that this rule did not fall within these criteria, and that it was therefore valid.[7]
 
 
 55
 In Republic Steel Corp. v. Costle, 621 F.2d 797 (1980), the Sixth Circuit expressly agreed with the Seventh Circuit that, in the situation this group of cases presents, the Administrator was justified in invoking section 553(b)(3). 621 F.2d at 804. We quote in full the Sixth Circuit's discussion of the statutory schedule:
 
 
 56
 . . . Congress had confronted (the Administrator) with the second of two mandatory attainment dates for national air quality standards for sulfur dioxide and it was obvious that the January 1, 1979, date could not be achieved if notice and comment procedures were allowed in advance. It would, indeed, have been "impracticable" to ignore the January 1, 1979, date.
 
 
 57
 621 F.2d at 803. Like the Seventh Circuit, the Sixth was patently impatient with "the long delays in implementation" of the Clean Air Act. 621 F.2d at 804. The court thus found part of its justification for the Administrator's action in the fact that he had "every reason to contemplate a continuation" of the "immediate and repetitive protest and litigation" which had followed EPA's earlier attempts to reduce sulfur-dioxide pollution in Ohio. 621 F.2d at 803. Furthermore, the court believed that "the Administrator could not comfortably rely upon the Ohio EPA's designation of attainment and nonattainment areas since experience had taught that the Ohio EPA was much more concerned with industry interests than those of the general public." 621 F.2d at 803.
 
 III
 
 58
 As we said above, we accept the reasoning followed and the result reached by the Third and Fifth Circuits, and we hold that the Administrator erred in declining to adhere to the notice-and-comment requirements of section 553 of the APA. Since we have recounted that reasoning in some detail, we need not retrace it here; but we do wish to identify some of the considerations which persuade us that that reasoning is correct as well as some of those which compel us to reject the holdings of the Sixth and Seventh Circuits.
 
 
 59
 First, we emphasize that judicial review of a rule promulgated under an exception to the APA's notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed. In American Bus Association v. US, 627 F.2d 525 (D.C.Cir.1980), where we investigated at length another exception to the notice-and-comment requirement of section 553, we said that that section "was one of Congress's most effective and enduring solutions to the central dilemma it encountered in writing the APA reconciling the agencies' need to perform effectively with the necessity that 'the law must provide that the governors shall be governed and the regulators shall be regulated, if our present form of government is to endure.' " 627 F.2d at 528 quoting S.Doc. No. 248, 79th Cong., 2d Sess. 244 (1946). It is now a commonplace that notice-and-comment rule-making is a primary method of assuring that an agency's decisions will be informed and responsive. And we have previously explained that, "if the Agency, in carrying out its 'essentially legislative task,' has infused the administrative process with the degree of openness, explanation, and participatory democracy required by the APA, it will thereby have 'negate(d) the dangers of arbitrariness and irrationality in the formulation of rules . . . ," Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1027-28 (D.C.Cir.1978).
 
 
 60
 From this, it should be clear beyond contradiction or cavil that Congress expected, and the courts have held, that the various exceptions to the notice-and-comment provisions of section 553 will be narrowly construed and only reluctantly countenanced. S.Doc. No. 248, 79th Cong., 2d Sess. 19, 199, 258 (1946); American Bus, 627 F.2d at 529; Humana of South Carolina v. Califano, 590 F.2d 1070, 1082 (D.C.Cir.1978); National Nutritional Foods Association v. Kennedy, 572 F.2d 377, 384 (2nd Cir. 1978); National Wildlife Federation v. Snow, 561 F.2d 227, 232 (D.C.Cir.1976). Nowhere did Congress make its intention in this respect plainer than in its deliberations over the very exception respondent cites. The Senate Committee responsible for the APA warned:
 
 
 61
 The exemption of situations of emergency or necessity is not an "escape clause" in the sense that any agency has discretion to disregard its terms or the facts. A true and supported or supportable finding of necessity or emergency must be made and published. "Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings.
 
 
 62
 S.Doc. No. 248, 79th Cong., 2d Sess. 200 (1946) (emphases added). The Committee concluded its report by reminding courts of their particular obligation to enforce the APA through a meticulous and demanding interpretation of its terms:
 
 
 63
 It will thus be the duty of reviewing courts to prevent avoidance of the requirements of the bill by any manner or form of indirection, and to determine the meaning of the words and phrases used. For example, in several provisions the expression "good cause" is used. The cause so specified must be interpreted by the context of the provision in which it is found and the purpose of the entire section and bill. Cause found must be real and demonstrable.
 
 
 64
 Id. at 217. As the Fifth Circuit commented in U. S. Steel,
 
 
 65
 This exception should be read narrowly. It is an important safety valve to be used where delay would do real harm. It should not be used, however, to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them.
 
 
 66
 595 F.2d 207, 214 (5th Cir. 1979) (citation and footnote omitted). Accord, Sharon Steel, 597 F.2d at 379; American Iron & Steel Institute v. EPA, 568 F.2d 284, 292 (3d Cir. 1977).
 
 
 67
 Our understanding of the purposes of notice-and-comment rule-making leads us to the second consideration which inclines us to accept the reasoning of the Third and Fifth Circuits. The Sixth and Seventh Circuits assume that the goals of the Clean Air Act and the Administrative Procedure Act irreconcilably conflict, and no doubt the facts and background of U. S. Steel and Sharon Steel suggest that the rules of the latter Act may be employed to thwart the goals of the former. But this assumption fundamentally misconceives the purpose and shrugs off the wisdom of the APA. Both the case at bar and our explication of the APA show that the APA may be deployed to insure that the Administrator fulfills his obligations under the Clean Air Act: Here petitioner is challenging the Administrator's decision that a large expanse of the country need not be designated "nonattainment" and hence need not be required to establish special programs to reduce pollution.[8] The agency itself seems originally to have contemplated that, "in the absence of data showing attainment, all areas east of the Mississippi River should be presumed nonattainment."[9] If the agency scanted its duty under the Clean Air Act when it subsequently cut back the regions to be designated nonattainment, the protests of affected parties such as New Jersey are the congressionally mandated and perhaps the only systematic means of identifying the error and urging its reformation. Furthermore, the case at bar points up the lesson that, in the implementation of the Clean Air Act, where the heaviest responsibilities rest upon state governments and where federalism concerns are implicated,[10] the usefulness and desirability of the APA's notice-and-comment provision may be magnified.
 
 
 68
 Our third, and basic, consideration is that, whatever one's conclusions about the general compatibility of the APA and the Clean Air Act, the Third and Fifth Circuits have demonstrated that, under the facts of this case, the Administrator could have reconciled the commands of the two acts by publishing the designations submitted to him by the states as proposed rules. See Sharon Steel, 597 F.2d at 380; U. S. Steel (Fifth Circuit), 595 F.2d at 213-14; text at 1042-1043 supra. Neither the Seventh and Sixth Circuits nor respondents have shown us how that reconciliation might be unsatisfactory. If the admonition to construe the good-cause exception of section 553(b)(B) narrowly means anything, it means that we cannot condone its invocation where, as here, such a reconciliation is possible.
 
 
 69
 The Seventh Circuit builds its analysis of the Administrator's choices on two cases which, it says, applied the good-cause exception to accommodate a "tight statutory schedule." While we do not contend that a statutory schedule can never preclude notice-and-comment rule-making, we doubt these two cases will bear the precedential weight placed on them. Specifically, the Seventh Circuit describes Clay Broadcasting Corp. v. United States, 464 F.2d 1313 (5th Cir. 1972), rev'd on other grounds sub nom. National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), as holding that "the FCC had good cause to dispense with rulemaking before altering a license fee schedule . . . ." 605 F.2d at 287. In fact, the FCC had entirely complied with the requirements of notice-and-comment rule-making. 464 F.2d at 1316-17. The only "good cause" issue in the case arose in respect to whether the FCC had erred in excepting the rule from APA section 553(d )'s requirement that rules be published at least thirty days before they become effective. 464 F.2d at 1320. In Energy Reserves Group v. FEA, 447 F.Supp. 1135 (D.Kan.1978), the time statutorily allotted for the promulgation of regulations was so extraordinarily short fifteen days that notice and comment were "unavoidably prevented," S.Doc. No. 248, 79th Cong., 2d Sess. 200 (1946), in an almost physical sense. In addition, the holding in Energy Reserves Group equally relied on "the necessity to quickly decontrol stripper lease prices once Congress' intent to do so was statutorily mandated in order that oil not be held off the market in anticipation of such price increase . . . ." 447 F.Supp. at 1150.
 
 
 70
 Both the Sixth and Seventh Circuits' analyses of the Administrator's choices hinged in part on their perception that the Administrator had had to take into account the past recalcitrance of certain states and corporations. We need not decide what weight should be given to evidence of this kind of behavior, since no such evidence has been presented to us in this case.[11]
 
 
 71
 Our fourth consideration is that we cannot accept in any absolute form the Sixth and Seventh Circuits' argument that the Administrator cannot be reversed here because to do so would delay implementation of the Clean Air Act. An agency's functions will be impaired any time it is reversed on procedural grounds, and such occasional impairments are the price we pay to preserve the integrity of the APA. Of course, cases under the "tight schedule" version of good cause are sure to be particularly troublesome in this respect, since if an agency's allegations as to the need for expedition are remotely true, the elapse of time necessary to secure judicial review will assure that a court cannot easily reverse the agency. But a court serves neither the law nor, ultimately, the parties before it by succumbing, without a cautious examination of a case's facts, to whatever fait accompli an agency may choose to present. Fortunately, such an examination of this case indicates that, for reasons which were discussed above and will appear again below, see text at 1050 infra, our reversal of the Administrator should not noticeably interfere with, and may actually promote, the ends of the Clean Air Act.
 
 
 72
 The fifth and final consideration which compels us to accept the conclusions of the Third and Fifth Circuits and to reject those of the Sixth and Seventh is our conviction that the Seventh Circuit's two alternative rationales for its holding are meritless. The first of these alternatives is predicated upon the "good cause" exception of subsection 553(d). The court takes pains to show that that exception is broader than the "good cause" exception of subsection 553(b)(B). This may well be true, but it is wholly irrelevant here, since subsection 553(d) says nothing about whether notice-and-comment rule-making is required. Rather, that subsection simply states:
 
 
 73
 The required publication or service of a substantive rule shall be made not less than 30 days before its effective date . . . .
 
 
 74
 The plain language of the subsection; the statute's structural separation of its requirements that a rule be preceded by notice and comment (subsection 553(b)-(c)) and that, once written, a rule be published before it becomes effective (subsection 553(d)); and the statute's legislative history make it thoroughly plain that subsection 553(d) "does not provide procedures alternative to notice and other public proceedings required by the prior subsections of this section." S.Doc. No. 248, 79th Cong., 2d Sess. 201 (1946). See id. at 258-59.
 
 
 75
 The Seventh Circuit's second alternative holding was derived from subsection 7607(d)(9) of the Clean Air Act. That subsection allows courts to reverse the Administrator only under circumstances which arguably are not present here.[12] See text at 1044 supra. However, subsection 7607(d) is expressly confined to actions taken under a list of specified provisions of the Act.[13] Subsection 7407(d), under which the Administrator acted in this case, is not among the provisions listed. See U.S. Steel (5th Cir.), 595 F.2d at 215 n.18.
 
 
 76
 In his brief, the Administrator adverts to the Seventh Circuit's interpretation of subsection 7607(d), and, though he treats that interpretation somewhat obliquely, he seems to ask us to adopt it.[14] The Administrator does not point out, however, that subsection 7607(d) establishes, for those actions taken under one of the subsection's list of specified provisions, procedures (particularly notice and comment procedures) more elaborate than those required by the APA. For instance, the subsection requires the Administrator to establish a rule-making docket for such action; to provide, with the notice of a proposed rule-making, a full-dress statement of its basis and purpose; to maintain the docket for public inspection and copying; to allow any person to submit written comments; to permit interested persons to address the agency orally as well as in writing; to keep the record open for thirty days after the proceedings' end for rebuttal and supplementary comments; and, when actually promulgating the rule, to publish another full-dress statement of basis and purpose along with a response to each significant comment received. Subsection 7607(d)(10), to which respondents' brief does not refer, specifically provides for the possibility that these procedures will bring about a conflict with a statutory schedule:
 
 
 77
 Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.
 
 
 78
 The subsection does not provide for a "good cause" exception to its procedural requirements. Respondents, of course, made no effort to follow many of the procedures prescribed in subsection 7607(d), presumably because actions taken under subsection 7407(d) are not among the actions to which, by its terms, subsection 7607(d) applies. Thus it would ill behoove the Administrator to invoke on review the features of that subsection which might seem to bolster his argument. We assume that the Administrator's statement that our jurisdiction arises from subsection 7607(b) is an acknowledgement of this fact. Respondents' Brief at 1.
 
 IV
 
 79
 It will be recalled that, after promulgating a "final rule" which was to be effective "immediately," the Administrator stated the Agency would accept public comments received within sixty days of the promulgation of the rule. 43 Fed.Reg. 8962 (March 3, 1978). The Administrator now argues that his provision for post hoc comment "cures" his failure to follow section 553's procedures. We cannot agree.
 
 
 80
 Once again, we accept the reasoning of the Fifth Circuit in its U.S. Steel :
 
 
 81
 Section 553 is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas. Other courts have recognized this difference and rejected arguments similar to that asserted here:
 
 
 82
 Permitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way. . . . "We doubt that persons would bother to submit their views or that the Secretary would seriously consider their suggestions after the regulations are a fait accompli."
 
 
 83
 . . . Were we to allow the EPA to prevail on this point we would make the provisions of § 553 virtually unenforceable. An agency that wished to dispense with pre-promulgation notice and comment could simply do so, invite post-promulgation comment, and republish the regulation before a reviewing court could act.
 
 
 84
 595 F.2d at 214-15.[15] Accord, Sharon Steel, 597 F.2d at 381.[16] We are convinced that the Fifth Circuit accurately assessed the psychological and bureaucratic realities of post hoc comments in rule-making. It was in recognition of those realities that Congress specified that notice and an opportunity for comment are to precede rule-making. Further, we note that, while both the Sixth and Seventh Circuits accepted the Administrator's argument in this respect, those circuits had evidence that the Agency had been sufficiently open-minded that it had actually made changes in its rules in response to comments received. U.S. Steel, 605 F.2d at 291; Republic Steel, 621 F.2d at 803. Although the agency responded to New Jersey's comments after litigation had been instituted[17] we are not aware that the Agency made any significant changes in its oxidant-pollution designations in response to New Jersey's comments. Perhaps the Administrator's designations ought not be changed, but the fact remains that we have no evidence to rebut the presumption that post hoc comment was not contemplated by the APA and is generally not consonant with it.
 
 V
 
 85
 Both the Third and Fifth Circuits diligently sought to ensure that, on remand, the Agency will be able to follow those procedures most in accord with the goals of the Clean Air Act. U.S. Steel, 595 F.2d at 215-18; Sharon Steel, 597 F.2d at 381-82. We are greatly assisted in following their example by the fact that petitioner challenges only designations of "attainment" or "unclassifiable" as to oxidant pollution. We therefore set aside only those challenged designations and remand the record for reconsideration of them.
 
 
 86
 That reconsideration must, certainly, be preceded by notice of the designations proposed and by opportunity for public comment, as section 553 prescribes. Reconsideration, and any consequent alterations of state implementation plans, shall proceed as expeditiously as possible. In no case shall a stage of the reconsideration process extend beyond the time allotted for such stage by 42 U.S.C. § 7407. In view of the need for expedition, we retain jurisdiction over the case so that parties will be able to submit motions to us where necessary to secure the prompt and proper accomplishment of the mandate of the Clean Air Act.
 
 
 87
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Clean Air Act of 1955, Pub.L. 84-159, ch. 360, 69 Stat. 322, July 14, 1955 (originally codified at 42 U.S.C. §§ 1857-1858); Clean Air Act Amendments of 1970, Pub.L. 91-604, 84 Stat. 1676, Dec. 31, 1970 (formerly codified at 42 U.S.C. §§ 1857-1858); Clean Air Act Amendments of 1977, Pub.L. 95-95, 91 Stat. 685, Aug. 7, 1977 (recodified at 42 U.S.C. §§ 7401-7642 (Supp. I 1977))
 
 
 [2]
 For convenience' sake we refer to the respondents interchangeably
 
 
 [3]
 The court acknowledged that, on this schedule, the Administrator would have missed the statutory deadline of February 3. But like the court in U. S. Steel, 595 F.2d at 213, the court in Sharon Steel pointed out that he missed it anyway. 597 F.2d at 380 & 380 n.7
 
 
 [4]
 The word "unavoidably" appears at both pages cited from the Senate and House Reports, though it does not appear in the Seventh Circuit's quotation from those pages
 
 
 [5]
 The cases were Clay Broadcasting Corp. v. United States, 464 F.2d 1313 (5th Cir. 1972), rev'd on other grounds sub nom. National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), and Energy Reserves Group v. FEA, 477 F.Supp. 1135 (D.Kan.1978). See text at 1047 infra for the reasons we reject the Seventh Circuit's reading of these cases
 
 
 [6]
 The court appended a footnote to its discussion of the good-cause exception which read, in part, "This opinion has been circulated among all judges of this Court in regular service. A majority did not favor a rehearing in (sic ) banc on the question of this difference among circuits." 605 F.2d at 289 n.11
 
 
 [7]
 On January 15, 1980, the Supreme Court denied a petition for a writ of certiorari in the Seventh Circuit's U. S. Steel case. 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672. Justice Rehnquist, with whom Justice White and Justice Powell joined, dissented, saying that the Seventh Circuit's decision was "in square conflict with the decisions of two other courts of appeals." Id. Justice Rehnquist wrote that this fact, in tandem with the Seventh Circuit's expansive interpretation of section 7607(d)(9), made the case "a formidable candidate for review." 100 S.Ct. at 712. (He added, "The fact that the requirements of the Clear (sic ) Air Act Amendments virtually swim before one's eyes is not a rational basis, under these circumstances(,) for refusing to exercise our discretionary jurisdiction." Id.)
 
 
 [8]
 Congress's concern that the Administrator's performance of his duties under the Clean Air Act be checked by public scrutiny and participation is especially conspicuous in 42 U.S.C. § 7604(a), which gives "any person" authority to bring a civil action in federal court "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator," and against any person who is in violation of certain provisions of the Act. This authority to bring an action is without regard to the amount in controversy, and under subsection 7604(d) reasonable attorney and expert-witness fees may be awarded
 
 
 [9]
 We quote here from a "Model Letter From Regional Administrators to State Agencies," which accompanied a Memorandum from David G. Hawkins, Assistant Administrator for Air and Waste Management, to EPA Regional Administrators
 We of course intimate no view as to the correctness of the Administrator's designations.
 
 
 [10]
 See generally Stewart, Pyramids of Sacrifice? Federalism Problems in Mandating State Implementation of National Environmental Policy, 86 Yale L.J. 1196 (1977); Stewart, The Development of Administrative and Quasi-Constitutional Law in Judicial Review of Environmental Decisionmaking: Lessons from the Clean Air Act, 62 Iowa L.Rev. 713, 741-62 (1977)
 
 
 [11]
 It might be objected that our decision requires of the Administrator foresight equal to our hindsight. However, we believe that some imaginative accommodation of possibly conflicting statutory commands may legitimately be expected of the Administrator, and we note that the Third Circuit reports that "counsel for the Administrator conceded at oral argument that the Administrator had forewarning of these possible (legal) problems . . . ." Sharon Steel Corp. v. EPA, 597 F.2d 377, 382 (1979)
 
 
 [12]
 We emphasize that we need not, and therefore do not, decide whether the circumstances enumerated in subsection 7607(d)(9) exist here
 
 
 [13]
 The subsection also applies to "such other actions as the Administrator may determine." The Agency does not allege that the Administrator has made any such determination in respect to the rule before us
 
 
 [14]
 Respondents' Brief at 38-41. It is not certain from the material before us whether the EPA has ever unequivocally espoused the Seventh Circuit's view of subsection 7607(d)(9). In his dissent from the Supreme Court's denial of certiorari in the Seventh Circuit's U.S. Steel, Justice Rehnquist, referring to that circuit's holding under subsection 7607(d), said,
 Apparently uncomfortable with this holding, EPA (in its response to the petition for certiorari) attempts to dismiss it as dicta. It clearly is not.
 444 U.S. 1035, 1037, 100 S.Ct. 710, 711, 62 L.Ed.2d 672 (1980) (citation omitted).
 
 
 [15]
 The Fifth Circuit was quoting City of New York v. Diamond, 379 F.Supp. 503, 517 (S.D.N.Y.1974), quoting Kelly v. Department of Labor, 339 F.Supp. 1095, 1101 (E.D.Cal.1972). The Fifth Circuit noted that "(s)imilar conclusions were reached in Maryland v. EPA, 530 F.2d 215, 222 (CA4, 1975), vacated on other grounds sub nom. EPA v. Brown, 431 U.S. 99, 97 S.Ct. 1635, 52 L.Ed.2d 166 (1977), and Wagner Electric Corp. v. Volpe, 466 F.2d 1013, 1020 (CA3, 1972)." 595 F.2d at 215
 
 
 [16]
 "After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decisionmaker is likely to resist change."
 
 
 [17]
 The Agency might answer that its responses came after litigation had begun only because New Jersey brought suit on the last day assigned for public comment. This answer would only reinforce our point post hoc notice and comment comes so late in rule-making that there is no longer time or inclination for disinterested consideration of new views