684 F.2d 1007
 17 ERC 1833, 221 U.S.App.D.C. 485, 12
Envtl. L. Rep. 21,037
 KENNECOTT CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
ASARCO INCORPORATED and Magma Copper Company, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
The BUNKER HILL COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
MOLYCORP, INC., Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
ASARCO INCORPORATED, et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent.
 Nos. 80-2036, 80-2039 to 80-2041 and 81-1173.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 13, 1982.
Decided July 30, 1982.
 
 Petitions for Review of Orders of the Environmental Protection agency.
 David Booth Beers, Washington, D. C., with whom Frederick C. Schafrick, Nancy C. Shea, James E. Kaplan and Lucinda M. Finley, Washington, D. C., were on brief, for petitioners in Nos. 80-2039 and 81-1173.
 Alfred V. J. Prather, Washington, D. C., with whom Carl B. Nelson, Jr., Richard T. Witt, William F. Boyd and Edwin H. Seeger, Washington, D. C., were on brief, for petitioners in Nos. 80-2036 and 80-2040.
 E. William Cale was on brief for petitioner in No. 80-2041.
 Todd M. Joseph, Asst. Gen. Counsel, E.P.A., Washington, D. C., with whom Robert M. Perry, Gen. Counsel, E.P.A., Donald W. Stever, Patrick J. Cafferty and Jeffrey C. Smith, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.
 Before TAMM and ROBB, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 Opinion for the Court filed by Chief Judge MARKEY.
 MARKEY, Chief Judge:
 
 
 1
 Petitioners Kennecott Corporation (Kennecott), Phelps Dodge Corporation, Bunker Hill Company (Bunker), Molycorp, Inc. (Molycorp), Asarco, Inc. (Asarco) and Magma Copper Company (Magma) seek review of the final regulations of the Environmental Protection Agency (EPA) promulgated under Section 119 of the Clean Air Act (Act) as amended 42 U.S.C. § 7419, and governing issuance of primary nonferrous smelter orders (NSO's).[1] 40 C.F.R. Part 57, 45 Fed.Reg. 42514 et seq. (June 24, 1980). Asarco and Magma also seek review of EPA's denial of their petition for reconsideration of those regulations. We vacate and remand.
 
 Background
 
 2
 The Act requires that EPA designate air pollutants reasonably expected to endanger public health or welfare, and that it establish air quality standards for each designated pollutant.[2] 42 U.S.C. § 7409. In 1971, EPA established ambient standards for a number of pollutants, including sulfur dioxide (SO 2). 40 C.F.R. § 50.4.
 
 
 3
 The nonferrous smelting process produces waste gas streams, denoted "weak streams" and "strong streams," which contain quantities of SO 2. Constant control technology, typically a sulfuric acid plant, has been used to remove SO 2 from strong streams but has been considered ineffective in removing SO 2 from weak streams.[3] Smelters have therefore relied primarily upon dispersion techniques,[4] in conjunction with acid plants, to meet EPA standards.
 
 
 4
 In the 1977 amendments to the Act, Congress enacted § 123, 42 U.S.C. § 7423, providing that only constant control technology could be relied upon to meet ambient air quality standards. Congress created an exception, however, for nonferrous smelters, giving them additional time to develop new technology which would enable them to meet their emission limitations solely through constant controls. § 119, 42 U.S.C. § 7419.[5]
 
 
 5
 Before enactment of the 1977 amendments, EPA had concluded that constant control technology was reasonable for most smelters only to control "strong streams" and that constant control of "weak streams" was in most cases "economically unreasonable and could in some cases result in shutdown." EPA Stack Height Increase Guideline, 41 Fed.Reg. 7450, 7452 (1976). EPA had therefore allowed smelters to use dispersion techniques in conjunction with acid plants to meet ambient standards. In enacting § 119, Congress "confirmed the authority of EPA to pursue the Agency's present smelter policy." H.R.Rep.No.95-294, 95th Cong., 1st Sess. 61 (1977) (House Report), U.S.Code Cong. & Admin.News, p. 1077.
 
 
 6
 Section 119 authorized EPA or the States to issue up to two NSO's permitting a smelter to continue reliance for a limited time on dispersion techniques, where constant controls sufficient to meet the emission limitations for SO 2 were not "adequately demonstrated to be reasonably available."[6] During an NSO term, the smelter is required, however, to use constant control equipment in addition to dispersion techniques in attaining the ambient standards, § 119(d) (1)(C),[7] unless such equipment "would be so costly as to necessitate permanent, or prolonged temporary cessation of operations." § 119(d)(2).[8] A smelter already using constant and supplemental controls may not be required, as a condition of receiving a first NSO, to secure "additional continuous emission reduction technology" without a hearing. § 119(d)(4).[9] Finally, smelters receiving NSO's must commit reasonable resources to research and development of appropriate emission control technology. § 119(d) (1)(C)(ii).
 
 
 7
 EPA published proposed regulations implementing § 119 on January 31, 1979. 44 Fed.Reg. 6284 et seq. The proposed regulations set forth, inter alia, (1) a financial test for NSO eligibility, i.e., whether additional constant controls are "adequately demonstrated to be reasonably available" to the smelter pursuant to § 119(b)(3), and (2) operating requirements for the smelter's acid plant during the NSO term.
 
 
 8
 Under EPA's financial test, a smelter is eligible for NSO if it cannot install the required constant control equipment "without reducing the present value of (its) net income and terminal value below (its) current salvage value".[10] The test thus compares the net revenues a smelter would receive from its operations after installing constant controls with salvage value upon closure. Constant controls are deemed "reasonably available" if the smelter, on being required to install them immediately, would elect to continue operation, rather than close down. Hence the parties' appellation, "closure," to EPA's test. Revenue and cost forecasts for use in making that determination are based upon EPA estimates of metals prices, labor and energy costs, inflation rates, and the cost of capital.
 
 
 9
 Respecting operating requirements, the regulations provide that a smelter receiving an NSO must control all of its strong SO 2 streams in an acid plant and may bypass the acid plant only when necessary because of a malfunction or during start-up following acid plant closure for scheduled maintenance or halts in smelter production.[11]
 
 
 10
 Petitioners argued in comments to EPA that both the eligibility test and operating requirements contravene § 119. EPA rejected those arguments and published its final regulations on June 24, 1980 (45 Fed.Reg. 42514 et seq.). EPA acknowledged in a preamble that a portion of the economic forecast data in the eligibility test was not placed in the docket until shortly before promulgation, and announced that it would consider objections to that material as based on grounds "arising after the period for public comment".[12] EPA also stated in the preamble that the eligibility test was derived from economic feasibility tests used by the agency before enactment of § 119, citing financial analyses performed by EPA for two smelters.[13]
 
 
 11
 Petitioners Asarco and Magma jointly filed a petition requesting that EPA convene a proceeding to reconsider its eligibility test and forecast data, and asked that EPA provide additional materials respecting its prior economic tests.
 
 
 12
 Responding, EPA made certain changes which it termed "technical corrections" to some economic forecast data,[14] but refused to reinstitute notice and comment proceedings or to place additional materials in the docket.
 
 
 13
 Each of the petitioners here filed a petition for review of the final regulations on the ground that the regulations violate § 119. Kennecott and Bunker also assert unconstitutionality of § 110(a)(6) of the Act, 42 U.S.C. § 7410(a)(6), which forbids reduction of employees' pay as a result of using dispersion techniques under an NSO.[15] Molycorp says EPA improperly excluded molybdenum roasters from relief under § 119. The petitions were consolidated by order of this court dated September 3, 1980.
 
 
 14
 Asarco and Magma also filed a petition for review of EPA's denial of their petition for reconsideration, asserting certain procedural defects in EPA's rulemaking and saying that EPA thus violated certain requirements of § 307(d) of the Act.[16] That petition was consolidated with the others by order of this court dated March 12, 1981.
 
 Issues
 
 15
 (1) Whether EPA's financial test governing NSO eligibility is authorized under § 119.
 
 
 16
 (2) Whether EPA's regulations governing interim acid plant operation are consistent with § 119.
 
 
 17
 (3) Whether § 110(a)(6) constitutes an unconstitutional impairment of contract.
 
 
 18
 (4) Whether EPA properly excluded molybdenum roasters from relief under § 119.
 
 
 19
 (5) Whether EPA violated the procedural requirements of § 307(d) in its rulemaking proceedings.
 
 Opinion
 
 20
 (1) Financial Test Governing NSO Eligibility
 
 
 21
 Under § 119(b)(3), a smelter is eligible for an NSO if the constant controls required to meet the ambient standards for SO 2 have not been "adequately demonstrated to be reasonably available" to the smelter, "as determined by the Administrator, taking into account the cost of compliance, non-air quality health and environmental impact, and energy consideration."
 
 
 22
 Petitioners say that EPA's "closure," i.e., shut down of all operations, test is inconsistent with § 119(b)(3); that the legislative history of § 119 makes clear that "reasonably available" is a less strict standard than closure and was intended to measure whether a smelter would experience a significant decrease in profitability if constant controls were required.
 
 
 23
 In response, EPA says: that § 119(b)(3) gives the agency broad discretion in formulating an eligibility test, leaving to the agency the precise means and criteria for assessing the significance of the costs of compliance; that had Congress intended application of a specific test, such as that focusing on profitability as suggested by petitioners, it would have expressly so provided; that Congress in § 119(b)(3) adopted EPA's pre-1977 practice of authorizing the use of dispersion techniques when the only alternatives are permanent production curtailment, shutdown or delays in attainment of the national standards; and that in enacting § 119(b)(3), Congress endorsed the holding in Kennecott v. EPA, 526 F.2d 1149 (9th Cir. 1975).
 
 
 24
 In reviewing substantive challenges, a court may reverse only those EPA actions found "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law...." § 307(d)(9).[17] Though the court must engage in a "searching and careful" inquiry into the facts, Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), it may not substitute its judgment for that of the Administrator. Id.
 
 
 25
 We look first to the statute before us, for agency action contrary thereto is necessarily "not in accordance with law." Section 119(b)(3) requires that EPA determine whether controls are "reasonably available." In making its determination, EPA's application of a closure standard is, in our view, inconsistent with that statutory mandate. To employ EPA's "if" approach, had Congress intended that a closure standard be applied, it could have chosen language similar to that of § 119(d)(2), supra, note 8, wherein it required NSO applicants to demonstrate that interim use of constant controls would cause a "cessation of operations." Indeed, Congress' election to employ "cessation" in § 119(d)(2), and to employ the distinctly different standard "reasonably available" in § 119(b)(3), is strong evidence that Congress intended application of something less than a "closure" test in determining eligibility for an NSO under § 119(b)(3).
 
 
 26
 In the 1977 amendments, as EPA correctly states, Congress clearly intended to adopt the substance of EPA's then existing smelter policy. House Report at 61. The legislative history of those amendments, however, establishes that Congress viewed that policy as mandating a standard short of "closure" or smelter shutdown. The House Report indicates that Congress viewed that policy as allowing use of dispersion techniques if constant controls were "economically unreasonable." House Report at 63. Quoting from EPA's Stack Height Guideline, supra, the report states: "In the case of existing smelters, BACT (best available control technology) will, in most cases, be economically unreasonable and could, in some cases result in shutdown." Id. That the House Report introduces that quotation with: "Retrofitting existing smelters involves additional problems, which EPA cited in the Legal Interpretation and Guidelines explaining its present policy", indicates the House Committee's understanding that the Stack Height Guideline did two things: it set forth problems of retrofitting existing smelters; and it explained EPA's existing policy. Moreover, the report noted that § 119 is necessary because of "technological and economic problems confronting existing primary nonferrous smelters." Quoting from EPA's new source performance standards for primary nonferrous smelters (41 Fed.Reg. 2332 (1976)), the report described the difficulties involved in installing constant controls as producing "a significant decrease in profitability, a significant loss in sales, or a closing of some mines and a decrease in mining activity." Id. Contrary to EPA's contentions, Congress did not, therefore, endorse a test based solely on preventing smelters from closing. As the legislative history makes clear, it sought to provide relief to the nonferrous smelter industry from a number of adverse economic consequences short of actual shutdown.
 
 
 27
 Nor does the holding in Kennecott in any manner indicate the view that Congress endorsed a closure test. Though the court in Kennecott approved EPA's implementation plan for Nevada which allowed use of dispersion techniques "when the only alternatives are permanent production curtailment, shutdown or delays in attainment of the national standards," 526 F.2d at 1151-52, n. 13, the court did not reach the issue of whether use of dispersion techniques is equally appropriate in other circumstances. It was undisputed in that case that it was economically infeasible for Kennecott to rely solely on constant controls in attaining the ambient standards at its Nevada smelter. The only issue litigated in Kennecott was whether EPA could ever require constant controls where a smelter could attain the ambient standards solely through use of dispersion techniques. Thus, contrary to EPA assertions, the court neither analyzed nor endorsed the position EPA asserts here.
 
 
 28
 Because EPA's regulations establishing a closure standard are based on misinterpretation of the phrase "reasonably available" in § 119(b)(3), they are without support in the statute and are contrary to the intent gleanable from the statute's legislative history. They are therefore not in accordance with law and cannot stand.[18](2) Interim Acid Plant Operation
 
 
 29
 Petitioners Asarco and Magma assert that EPA's rules requiring treatment of all SO 2 strong streams in an acid plant[19] are violative of § 119. Those rules allow a smelter under an initial NSO to bypass the strong stream acid plant in some circumstances.[20] Asarco and Magma say, however, that bypass should also be permitted during periods of excess SO 2 production and periods of essential scheduled maintenance, because a smelter would otherwise have to curtail production significantly or install a second acid plant. If a smelter curtails production, Asarco and Magma say it will, contrary to the intent of § 119, suffer a significant decrease in profitability and a significant loss in sales. They say forced installation of a second acid plant conflicts with § 119(d)(4), supra, note 9, which prohibits EPA from requiring further constant controls during an initial NSO without a hearing where the smelter already uses an acid plant and dispersion techniques. Though Asarco and Magma concede that EPA's existing smelter policy did not allow bypass during those periods and that Congress in § 119 confirmed the general principles of EPA's existing policy, they say § 119(d)(4) evidences Congress' rejection of EPA's policy specifically respecting acid plant bypass.
 
 
 30
 We cannot agree with Asarco and Magma's basic premise. There is, on this record, no basis to conclude that EPA's bypass rules require a smelter to install additional acid plant capacity. EPA has imposed no such requirement on either Asarco or Magma. Section 119(d)(4) is thus not on this record implicated, and we need not discuss petitioners' interpretations thereof. Comments on the proposed rules indicated only three smelters at which excess gas might be a problem-Asarco's smelters at Hayden and Tacoma and the Magma smelter.[21] Magma asserted that its acid plant was designed to handle the full gas volume but that leakage in the flue system resulted in a gas volume exceeding acid plant capacity, necessitating bypass or production curtailment.[22] EPA found that the excess gas could be reduced or eliminated by improved maintenance of flue systems.[23] That finding is reasonable and supported by testimony of a Magma employee and by that of Asarco's Hayden plant manager. The challenge of that finding, based on contradictory statements in Magma's submissions to EPA concerning its acid plant problems and maintenance programs underway,[24] is misplaced here. It is not our function to "resolve disagreements ... or to judge the merits of competing ... views." Lead Industries Assoc. v. EPA, 647 F.2d 1130, 1160 (D.C.Cir.1980). Our task in relation to this issue is the limited one of ascertaining that the finding made by EPA was reasonable and supported by the record. The mere presence of evidence that may support conclusions inconsistent with those of EPA does not require us to conclude that the latter were improper. Id. There is thus no basis in this record for requiring that EPA's rules be revised to permit bypass of the acid plant during periods of excess SO 2 production.
 
 
 31
 Respecting bypass for scheduled maintenance, EPA determined that production foregone during scheduled maintenance could be rescheduled at other times. Though Asarco and Magma say a smelter cannot increase its production "at will," they do not dispute EPA's finding that sufficient opportunities exist to make up for production foregone during scheduled maintenance. There is thus no basis in this case for requiring that EPA's rules be revised to permit bypass of the acid plant during periods of scheduled maintenance.
 
 
 32
 Thus EPA's rules governing interim acid plant operation do not in this case result in a forced addition of a second acid plant, and do not, therefore, implicate § 119(d)(4).
 
 
 33
 (3) Constitutionality of § 110(a)(6)
 
 
 34
 Section 110(a)(6) of the Act prohibits reduction of any employee's pay resulting from use of dispersion techniques.[25] Kennecott and Bunker's argument that § 110(a)(6) constitutes an unconstitutional impairment of labor contracts is without merit. Though Article I, Section 10 of the Constitution is applicable only to the states, the courts have recognized a similar limitation present in the due process clause of the Fifth Amendment. See Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947, 960 (7th Cir. 1979), aff'd on other grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).
 
 
 35
 Courts routinely uphold statutes which, like § 110(a)(6), seek to promote a national purpose (here, clean air) and, at the same time, to adjust the economic burden involved in achieving that purpose. Such legislative acts, "adjusting the burdens and benefits of economic life (carry) a presumption of constitutionality and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). In enacting § 110(a)(6) Congress reasonably implemented its desire to insure that smelter employees do not pay disproportionately for pollution controls.[26] The section also coincides with Congress' overall intent to diminish incentives for use of dispersion techniques vis-a-vis constant controls. Whether the section is unnecessary because, as Kennecott and Bunker suggest, Congress could have elected to pay idled workers from general tax revenues, is a matter in this case for legislative, not judicial, judgment. Section 110(a)(6) is a reasonable exercise of Congress' power, which, though it adjusts the "burdens and benefits of economic life", is not unconstitutional.
 
 
 36
 (4) Exclusion of Molybdenum Roasters
 
 
 37
 Molycorp says that EPA erred in determining that a molybdenum roaster is not a "nonferrous smelter" for purposes of § 119, and in limiting eligibility for relief under that section to copper, lead and zinc smelters. 40 C.F.R. § 57.102(a), 45 Fed.Reg. 42536.
 
 
 38
 EPA says Congress explicitly sought to adopt EPA's existing smelter policy which did not apply to molybdenum roasters; and that there is no basis for interpreting § 119 as including them.
 
 
 39
 Neither the Act nor its legislative history has a word to say respecting the breadth to be given the term "nonferrous smelter."[27] Section 119 provides that a "primary nonferrous smelter order" may be issued to a "primary nonferrous smelter." "Nonferrous" is not a term of art or a specifically technical term. It is unambiguous, encompassing all that which is not ferrous, that is, "of, relating to, or containing iron". Webster's New Collegiate Dictionary (4th Ed. 1976). Molybdenum is not ferrous. EPA does not contest the view that a roaster is a form of smelter. Courts will disregard a term's literal meaning where it is evident that a special or limited meaning was intended or necessary to effectuate legislative intent. Malat v. Riddell, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). There is no such indication here. On the contrary, Congress' use of the broad term, without definition or limitation, would indicate an intent contrary to EPA's election to limit nonferrous smelters to those engaged in the smelting of copper, lead, and zinc. That no EPA actions involving molybdenum roasters had occurred at the time § 119 was enacted is alone insufficient to establish that Congress intended to exclude such facilities.
 
 
 40
 Because a molybdenum roaster falls clearly, on this record, within the statutory term "nonferrous smelter," EPA's election to exclude it was not in accordance with law and was thus error.
 
 
 41
 (5) Procedural Requirements of § 307(d)
 
 
 42
 In reviewing alleged procedural errors, this court may invalidate EPA rules only if EPA's failure to observe procedures was arbitrary, specific objections were timely or were of central relevance to the outcome, and the errors were so serious and related to matters of such relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made. § 307(d)(9)(D), 42 U.S.C. § 7607(d)(9)(D).[28]
 
 
 43
 Asarco and Magma urge that EPA violated the procedural requirements of § 307(d) by not placing in the docket for public comment certain data relating to the basis for its NSO eligibility test, including the two prior EPA financial analyses referred to in the preamble to the final regulations.
 
 
 44
 Section 307(d)(3) requires that notice of proposed NSO regulations be accompanied by a statement of their basis and purpose, including the factual data on which the proposed regulations are based, the methodology used in obtaining and analyzing the data, and the major legal interpretations and policy considerations underlying the proposed regulations.[29] When final regulations are promulgated, a statement meeting those same requirements must again be included, together with an explanation of any major changes in the proposed rules. § 307(d)(6).
 
 
 45
 Though EPA states in its preamble to the final regulations that its current eligibility test is based upon a closure policy adopted by EPA before 1977, and that it has used financial tests similar to the present closure test under the agency's existing policy, no documents embodying those tests or demonstrating the methodology used before 1977 were ever placed in the docket. The only document in the docket purporting to explain that a closure test was ever employed by EPA was a memorandum in which EPA economist Hale sets forth his recollection that such a test had been used before 1977 to determine whether smelters would be permitted to rely upon dispersion techniques to meet the ambient standards. That memo, dated August 17, 1979, was placed in the docket on March 12, 1980, approximately eleven months after the close of the public comment period, and reveals neither the actual tests nor the methodology used by EPA. The failure of EPA to observe the procedures mandated by §§ 307(d)(3) and 307(d)(6) was thus arbitrary and capricious.
 
 
 46
 EPA says it did not base the NSO closure test on the two prior financial analyses referred to in the preamble, and did not rely on those analyses in proposing or promulgating the present regulations. It says that the analyses are merely examples of the implementation of prior smelter policy used by EPA in evaluating whether the cost of installing constant controls would likely cause smelter shutdown and as such are not properly part of the docket.
 
 
 47
 That argument is disingenuous. In response to challenges that a closure test is inconsistent with § 119, EPA has elsewhere argued before us, as above indicated, that its closure test was based on EPA's interpretation of Congress' intent to adopt the basic features of the agency's existing smelter policy, that the analyses evidence use of a closure test under its prior policy, and that its closure test is consistent with a prior policy focus on shutdown rather than on profitability. If that argument be factually based, the financial analyses clearly form a basis for the regulations and should properly have been included in the docket. In all events, absence of those documents, or of comparable materials showing the nature and scope of its prior practice, makes impossible any meaningful comment on the merits of EPA's assertions. In all the circumstances, EPA's failure to include such documents constitutes reversible error, for the uncertainty that might be clarified by those documents with respect to the test, the data, and the methodology used by EPA before enactment of § 119, indicates a "substantial likelihood" that the regulations would "have been significantly changed". § 307(d)(9)(D).[30]
 
 
 48
 Finally, Asarco and Magma correctly say that EPA violated § 307(d) in refusing to allow public comment on its economic forecast data. In Sierra Club v. Costle, 657 F.2d 298 (D.C.Cir.1981), this court, in approving EPA's use of an econometric computer model to forecast future impacts of alternative standards, stated that "(t)he safety valves in the use of such sophisticated methodology are the requirement of public exposure of the assumptions and data incorporated into the analysis and the acceptance and consideration of public comment." Id. at 334.
 
 
 49
 EPA neglected such "safety valves" in promulgating its NSO eligibility test. EPA's forecast data was placed in the docket only one week before promulgation of its final regulations and differed significantly from the forecast data provided during the public comment period. Thus, there has been no opportunity for the notice and comment proceedings contemplated by § 307(d) (5).[31] That EPA allowed petitions for reconsideration is not an adequate substitute for an opportunity for notice and comment prior to promulgation. See New Jersey v. EPA, 626 F.2d 1038 (D.C.Cir.1980). In New Jersey, this court held that reconsideration petitions were insufficient to cure EPA's failure to follow notice and comment provisions of the Administrative Procedure Act (5 U.S.C. § 553), and quoted with approval the 5th Circuit's statement in United States Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir. 1979), that "(p) ermitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rulemaking process in a meaningful way ..." 626 F.2d at 1049. There is no reason to imply a different rule under § 307(d). To the contrary, the Act specifically requires that EPA convene a proceeding for reconsideration of a rule where the objection is based on grounds arising after the period for public comment and is of central relevance to the outcome of the rule and also requires that EPA provide the same procedural rights that would have been afforded had the information been available at the time the rule was proposed. § 307(d)(7)(B).[32] Review of a petition for reconsideration is an inadequate substitute for the statutorily required hearing.
 
 
 50
 Because the reasonableness and accuracy of the forecast data is critical to whether a smelter can qualify for an NSO, Asarco and Magma's objections to that data, if well-founded, would clearly have been "of central relevance." § 307(d)(7)(B). In such circumstances, EPA's refusal to convene a new round of public comment proceedings constitutes reversible error under § 307(d)(9).[33]
 
 Conclusion
 
 51
 Because EPA's regulations governing NSO eligibility are inconsistent with § 119, being based on a misinterpretation of "reasonably available" in that section, and because EPA committed procedural errors in its rulemaking proceedings, those regulations cannot stand. The regulations are therefore vacated and remanded to EPA for further proceedings.
 
 
 52
 EPA's regulations governing interim acid plant operation are, on this record, sustained as consistent with the Act.
 
 
 53
 Section 110(a)(6) of the Act, which forbids a smelter to reduce employee pay because of use of dispersion techniques, is constitutional.
 
 
 54
 Because there is no evidence of a contrary congressional intent, and because the statutory term is unambiguous, NSO relief must be available to all "nonferrous smelters," including, on this record, molybdenum roasters.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 Each petitioner presently operates a nonferrous smelter and is affected by EPA's NSO regulations because it has either sought or anticipates seeking an NSO
 
 
 [2]
 § 7409. National primary and secondary ambient air quality standards
 (a) Promulgation. (1) The Administrator-
 (A) ... shall publish proposed regulations prescribing a national primary ambient air quality standard and a national secondary ambient air quality standard for each air pollutant for which air quality criteria have been issued ...;
 ....
 (b) Protection of public health and welfare. (1) National primary ambient air quality standards, prescribed under subsection (a) shall be ambient air quality standards the attainment and maintenance of which, ... are requisite to protect the public health.
 
 
 [3]
 Constant control technology removes pollutants from plant emissions on a continuous basis and before discharge to the atmosphere. In an acid plant, SO 2 is converted to sulfur trioxide and absorbed in a sulfuric acid-water solution. The resulting acid end product may be sold or disposed of as liquid waste. "Constant control technology" is a synonym for the statutory description "continuous emission reduction technology". Though "acid plant" is used as another synonym, because it is the only technology presently known, the statutory phrase is intended to encompass new technology developed with the funds committed under § 119(d)(1)(C)(ii)
 
 
 [4]
 Dispersion techniques are generally two: "tall stacks," which emit pollutants high into the atmosphere, where winds disperse them; and "variable systems", which involve variations in production emission rates in accord with predicted weather conditions affecting dispersion. Dispersion techniques are encompassed within the statutory phrase "supplemental controls"
 
 
 [5]
 See note 6 infra
 
 
 [6]
 § 119 provides in pertinent part:
 § 7419. Primary nonferrous smelter orders
 (a) Issuance; hearing; enforcement orders; statement of grounds for application; findings. (1) Upon application by the owner or operator of a primary nonferrous smelter, a primary nonferrous smelter order under subsection (b) may be issued-
 (A) by the Administrator ..., or
 (B) by the State in which such source is located, but no such order issued by the State shall take effect until the Administrator determines that such order has been issued in accordance with the requirements of this Act.
 ....
 (b) Prerequisites to issuance of orders. A primary nonferrous smelter order under this section may be issued to a primary nonferrous smelter if-
 ....
 (3) such smelter is unable to comply with such requirement ... because no means of emission limitation applicable to such smelter which will enable it to achieve compliance ... has been adequately demonstrated to be reasonably available (as determined by the Administrator, taking into account the cost of compliance, non-air quality health and environmental impact, and energy consideration).
 (c) Second Orders.
 ....
 (2) Not in excess of two primary nonferrous smelter orders may be issued under this section to any primary nonferrous smelter. The first such order issued to a smelter shall not result in the postponement of the requirement ... beyond January 1, 1983. The second such order shall not result in the postponement of such requirement beyond January 1, 1988.
 
 
 [7]
 § 119(d) reads in pertinent part:
 (d) Interim measures; continuous emission reduction technology. (1)(A) Each primary nonferrous smelter to which an order is issued under this section shall be required to use such interim measures for the period during which such order is in effect as may be necessary ... to assure attainment and maintenance of the national primary and secondary ambient air quality standards ....
 ....
 (C) Such interim measures shall ... except as provided in paragraph (2), include continuous emission reduction technology. The Administrator shall condition the use of any such interim measures upon the agreement of the owner or operator of the smelter-
 (ii) to commit reasonable resources to research and development of appropriate emission control technology.
 
 
 [8]
 § 119(d)(2) reads:
 (2) The requirement of paragraph (1) (§ 119(d)(1)) for the use of continuous emission reduction technology may be waived with respect to a particular smelter by the State or the Administrator, after notice and a hearing on the record, and upon a showing by the owner or operator of the smelter that such requirement would be so costly as to necessitate permanent, or prolonged temporary cessation of operations of the smelter.
 
 
 [9]
 § 119(d)(4) reads:
 (4) In the case of any smelter which ... (now) uses continuous emission reduction technology and supplemental controls and which receives an initial primary nonferrous smelter order ..., no additional continuous emission reduction technology shall be required as a condition of such order unless the Administrator determines, ... after notice and public hearing, that such additional continuous emission reduction technology is adequately demonstrated to be reasonably available for the primary nonferrous smelter industry.
 
 
 [10]
 44 Fed.Reg. 6308. That test is also contained in the final regulations. 45 Fed.Reg. 42551
 
 
 [11]
 That requirement is duplicated in the final regulations. 45 Fed.Reg. 42539-40
 
 
 [12]
 45 Fed.Reg. 42522 n.22a. An objection to a rule or procedure not raised during the public comment period will ordinarily not be reviewable except where the objection is based on grounds arising after the period. § 307(d)(7)(B)
 
 
 [13]
 45 Fed.Reg. 42517
 
 
 [14]
 EPA: 1) updated data used to convert nominal copper prices to real prices; 2) corrected inconsistent inflation indices for metals prices and costs of production; 3) updated forecasts of the cost of capital; 4) recalculated the terminal value factor; 5) eliminated the requirement that in calculating terminal value the applicant capitalize net income for 1986 plus after tax interest expense on long term debt. 45 Fed.Reg. 85011 (col. 3)-85014 (col. 1)
 
 
 [15]
 § 7410. State implementation plans for national primary and secondary ambient air quality standards
 (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems. (1) Each State shall ... submit to the Administrator, ... a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region ... within such State.
 ....
 (6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under ... section 119 ..., the owner or operator of such source may not temporarily reduce the pay of any employee by reason of (such) use ....
 
 
 [16]
 See note 29 and note 32 infra
 
 
 [17]
 § 307(d)(9) provides in pertinent part:
 § 7607. Administrative proceedings and judicial review
 ....
 (d) Rulemaking. (1) This subsection applies to-
 ....
 (G) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 119 ....
 ....
 (9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be-
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ....
 
 
 [18]
 Petitioners' objection that EPA's imposition of a single eligibility test usurps the role of the states is without merit. Though § 119 gives the states authority to issue NSO's, petitioners do not dispute that it also requires the states to submit each such NSO to EPA for approval. § 119(a)(1). Nor do petitioners dispute that, under § 119(b)(3), eligibility for an NSO is contingent on affordability of controls, "as determined by the Administrator." It is clear from § 119(b)(3) that Congress intended an independent determination by EPA in reviewing a state's affordability finding. That EPA may prescribe in advance the criteria the states must use in making affordability determinations appears clear from the statute. Section 301(a), 42 U.S.C. § 7601(a), empowers EPA to prescribe "such regulations as are necessary" to carry out its functions, one of which is to make affordability determinations. Section 301(a) also requires that regulations "asure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the Act." § 301(a)(2). Establishing a single set of criteria is consistent with that mandate. The alternative, establishing criteria on an ad hoc, incremental basis, as EPA evaluates NSO applications made to it and also evaluates NSO's submitted for approval by the states, would not result in the "fairness and uniformity" contemplated by Congress in enacting § 301(a)(2). See Trans-Pacific Freight v. Federal Maritime Commission, 650 F.2d 1235, 1244-45 (D.C.Cir.1980). On the same analysis, Kennecott and Bunker's argument that NSO rules relating to interim acid plant operation should not apply to state-issued NSO's is meritless. Section 119(d)(1)(A) requires use of such "interim measures as may be necessary in the judgment of the Administrator."
 Similarly without merit are Kennecott and Bunker's contentions (1) that, because EPA's pre-1977 smelter policy considered "reasonably available" controls to be control of strong streams in an acid plant, any smelter now using an acid plant should be eligible for an NSO under § 119(b)(3) without regard to its economic position, and (2) that EPA may not require constant control of weak streams unless it first holds hearings and determines that weak stream controls are "reasonably available" industry-wide in accordance with § 119(d)(4). Section 119(b)(3) clearly focuses on an individual smelter's, not an industry's, application for an NSO, and on whether "such smelter" is eligible, considering costs and other site-specific factors. Petitioners' argument is, moreover, inconsistent with EPA's pre-1977 policy, which applied a smelter-specific standard. EPA's industry-wide determination was that reasonably available control technology for strong streams existed in the form of an acid plant. Interpretation of § 119(b)(3) as allowing all smelters to use dispersion techniques without regard to economic feasibility would ignore Congress' desire for increased use of constant controls and its mere toleration of dispersion techniques.
 Petitioners' argument that a hearing is required under § 119(d)(4) is based on an apparent misunderstanding. That section does not relate to eligibility for an NSO, but to the nature of interim controls that may be required once an NSO has been granted.
 
 
 [19]
 40 C.F.R. § 57.301, 45 Fed.Reg. 42539-40
 
 
 [20]
 40 C.F.R. § 57.304, 45 Fed.Reg. 42540
 
 
 [21]
 Comments of Asarco, Inc. and Magma Copper Co. on Proposed NSO Regulations, pp. 36-41 (April 16, 1979). See also, 45 Fed.Reg. 42530
 
 
 [22]
 Id
 
 
 [23]
 45 Fed.Reg. 42530
 
 
 [24]
 Comments on Proposed Regulations, supra, note 21 at 41
 
 
 [25]
 Production and emissions are curtailed in response to poor atmospheric dispersion conditions. When dispersion conditions improve, production is increased. During curtailments, absent the statute, employees could be instructed not to report for work, or could be sent home early and their pay could be proportionately reduced
 
 
 [26]
 Witnesses, including representatives of health and labor groups, testified during hearings on the House bill that periodic curtailments due to dispersion techniques could force temporary layoffs of workers. House Report at 342-43
 
 
 [27]
 That Congress cited recognition of technological problems in "retrofitting existing nonferrous smelters, such as copper, zinc, silver, gold, and lead smelters" as a reason for its adoption of existing administrative policy allowing use of supplemental controls on nonferrous smelters (S.Rep.No.94-717, 94th Cong., 2d Sess. 17 (1976); S.Rep.No.95-127, 95th Cong., 1st Sess. 25 (1977)), is no indication Congress intended to limit the term "nonferrous smelter" to the smelter types listed as exemplars. To the contrary, the phrase "such as" suggests the five smelter types were listed as examples only and that that list was not intended to be exhaustive
 
 
 [28]
 § 307(d)(9)(D) provides:
 (d) Rulemaking
 ....
 (9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be-
 ....
 (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) (, the objection was raised with reasonable specificity during the period for public comment or arose after the period for public comment and is of central relevance to the outcome of the rule,) has been met, and (iii) the condition of the last sentence of paragraph (8) (, the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made,) is met.
 
 
 [29]
 § 307(d)(3) provides:
 § 7607 Administrative proceedings and judicial review
 ....
 (d) Rulemaking
 (3) In the case of any rule to which this subsection applies, notice of proposed rulemaking ... shall be accompanied by a statement of its basis and purpose ... The statement of basis and purpose shall include a summary of-
 (A) the factual data on which the proposed rule is based;
 (B) the methodology used in obtaining the data and in analyzing the data; and
 (C) the major legal interpretations and policy considerations underlying the proposed rule.
 
 
 [30]
 Asarco and Magma say they sought certain "materials" under the Freedom of Information Act. EPA converts that statement into one that Asarco and Magma "received both of these studies" and charges those petitioners with a failure to submit the "studies" to the court and a failure to again seek reconsideration, drawing the inference that the studies would not support the position of the petitioners. On the state of the present record, no such inference would be proper. The procedures observed by EPA must be judged here as of the time of the rulemaking
 
 
 [31]
 § 307(d)(5) reads:
 (5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.
 
 
 [32]
 § 307(d)(7)(B) provides:
 (B) (If) an objection to a rule or procedure is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed.
 
 
 [33]
 Asarco and Magma request that we order adoption of procedures permitting the cross-examination of economist Hale "arbitrarily" denied them by EPA. The Supreme Court has made clear, however, that courts must be particularly reticent about going beyond the procedures established by Congress and in requiring agencies to provide additional rulemaking procedures. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 540-548, 98 S.Ct. 1197, 1209-14, 55 L.Ed.2d 460 (1978). This court has held that judicial restraint is particularly appropriate where, as here, Congress considered and deliberately rejected a cross-examination requirement. Lead Industries Assoc. v. EPA, 647 F.2d 1130, 1170 (D.C.Cir.1980)